Argued April 3, reversed September 25, 1928.

RALPH JOHNSON *v.* OREGON STEVEDORING CO., INC., ET AL.

(270 Pac. 772.)

For appellants there was a brief over the names of *Messrs. Carey & Kerr, Mr. Omar C. Spencer* and *Messrs Wilson & Reilly,* with oral arguments by *Mr. Spencer* and *Mr. John F. Reilly.*

For respondent there was a brief over the name of *Messrs. Lord & Moulton,* with an oral argument by *Mr. Arthur I. Moulton.*

BROWN, J.—Some time in 1922 a group of waterfront employers of labor in Portland, Oregon, formed a voluntary association under the name of "Waterfront Employers' Union of Portland," now designated as "Waterfront Employers' Association." The objects of the association, as set out in Article II of the Constitution, are:

"Sec. 1. To protect and develop water borne commerce; to promote closer relationship, better understanding, uniformity of practice and co-ordination of effort among the employers. Further, to seek correct solutions of the problems affecting the common welfare of employers and employees; to assist, if possible, employees in solving their own problems, and to develop closer relationship between employers and employees.

"Sec. 2. In pursuance of the objects of this Union, each member shall keep, both in the letter and spirit, all agreements and understandings between themselves and between this Union, or the Northwest Waterfront Employers' Union and employees. Should any misunderstanding or breach of any agreement or understanding occur, affecting any member of this Union, the same shall be promptly reported to the board of directors of this Union for consideration and action."

Article III relates to membership. Section 1 thereof reads:

"Any person, firm, association or corporation engaged in the exporting, importing or shipping business, either as owner, agent or charterer or as contractor, employing labor in loading or unloading vessels at Portland and Columbia River except such ports as may be within the jurisdiction of Astoria Local, shall be eligible for membership in this Local, subject to the approval of its board of directors."

The rules governing employment of longshoremen as set down in the standard practice handbook for longshoremen, adopted by the Portland waterfront employers, read:

"The basis of employment is citizenship and efficiency.

"All hiring is done at the hall. Stevedores must not employ men at the dock, and men are not permitted to solicit work on docks.

"Members of the I. W. W. will not be employed.

"Drunkenness on the job or in the hall is cause for discharge.

"Quitting the Job. Men who quit their jobs, walk off ships or fail to return to work without permission from foreman or dispatcher, will be subject to ten days' suspension, or discharged if the offense is repeated.

"Smoking is prohibited on deck, ship, or gangplank.

"The foreman is responsible for the safe, efficient, and proper handling of cargo on board ship and therefore has authority to supervise and direct the work, place and discharge men.

"Safety First: Above all things, always consider 'Safety First.' Take no chances on your health or life. A little care will often save a broken limb or a trip to the hospital. The majority of accidents are caused by carelessness and could be avoided.

"The Dispatching Hall: The hall is maintained primarily for the convenience and comfort of the men and to enable the employers to secure their men in an orderly and dependable manner. The hall is your hall, and every employee should help to keep it clean, sanitary and attractive.

"The dispatchers are responsible for furnishing the best qualified men for the job and the general conduct of the hall. They will always be glad to answer your questions or give you any possible assistance in connection with your work.

"Advances: Money cannot be advanced on time work before pay day. * *

"Gambling, drinking, or the use of obscene language is positively prohibited in the hall.

"Suggestions from the men toward improvement of conditions in the hall or otherwise will always be welcome."

This practice book was revised and became effective January 1, 1924.

1. The foregoing documents were introduced by the plaintiff in support of his contention that, some time prior to October 12, 1922, the defendants entered into an unlawful and malicious conspiracy to blacklist and publish any employee discharged by any one of them, with the intent of preventing such discharged employee from securing like employment in the Port of Portland and Columbia River ports. These documents, however, fail to strengthen plaintiff's position. The purpose of the Waterfront Employers' Association, as evidenced by the writings set out above, is not to further a blacklisting scheme. No such evil intention is apparent from the writings: *Tilbury* v. *Oregon Stevedoring Co., Inc.*, 7 Fed. (2 ed.) 1; *Tilbury* v. *Oregon Stevedoring Co., Inc.*, 8 Fed. (2 ed.) 898. From a consideration of the articles of agreement and the handbook we cannot say that these defendants have associated themselves together with the object of wronging their employees by publishing and blacklisting any workman who may be discharged by them.

The plaintiff called as his witness J. O'Neil, manager of the hiring hall, who testified, in response to questions by Mr. Moulton, as follows:

"Q. Mr. O'Neil, by whom representing the Portland Waterfront Employers were you employed? A. By the employers that were maintaining this hiring hall."

He testified that his instructions were "to get efficient longshoremen and get them organized," and that those instructions had never been changed. He further testified:

"Q. * * Will you tell the jury what the fact is with respect to the maintenance of a list of employees? A. Well, down on the water front we have

to work under a system. We have 25 regular gangs, and naturally we have a lot of men hanging around there ready for immediate employment. We have an 'extra' board for these men and we put them on that when the work gets slack on longshoring, in order to hold them for the busy season.

"Q. How are these regular gangs made up? A. They are composed of gang leaders, winch drivers, and old experienced men, special men mostly, who are efficient longshoremen, and who have proven themselves as skillful.

"Q. Who selects these men? A. I do. * *

"Q. Do you have a list of employees of any kind? A. Yes, sir.

"Q. Who keeps that list? A. It is in a book there; the bookkeeper keeps it, and the dispatcher. * *

"Q. Do you issue registration cards? A. Yes, sir. * *

"Q. How do you determine or hire the men off the board? A. The regular gangs receive preference of all work. There are times when we have peak days and where we have not sufficient gangs; regular gangs to carry the work on the waterfront. Then we make up gangs off the extra board, and certain work like cement and other work, or unskilled work, we take that labor off this extra board.

"Q. And if the extra board runs out, then where do you get any men? A. I pick them up wherever we can.

"Q. What is the fact that in order for a man to obtain employment down at the hall at all, he must be in one of the three classes, either a member of the regular gang, or on the extra board, or have a permit card? A. No, that is not so. Many a morning I have had to go down on Burnside and pick up a couple of hundred men so as to carry a job.

"Q. You get men on the outside? A. Yes, our work varies from maybe two hundred men to sixteen or seventeen hundred.

"Q. Now, what is the purpose of the permit card? A. That is an identification card, is all. * * For in-

stance, a ship will send in for eight gangs of men. The walking boss has never seen the men before. * * Now maybe he works down at Terminal No. 4. He has to come to the Oregon Stevedoring Company, or some other firm, for his money; say down at Second & Ash, or way up town, and of course they don't know him, so he comes in with this card, which is his identification. It shows that this is the man that worked on that particular ship. * *

"(Cross-examination.)

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"Q. Mr. O'Neil, on the question of your authority, were you ever authorized or directed to keep any black list of employees who might be discharged by any of these people whom you represent? A. No, sir, I never have.

"Q. In your work down there, did you ever at any time keep any such black list? A. No, sir, no list, never.

"Q. How do you hire men for longshore work? A. We take the regular gangs first. They are men who first went onto the docks there, or in this work, when this was first organized. They have been together ever since and they have had the experience. * * They are experienced longshoremen. They have followed this business for years. * *

"Q. Are you an experienced longshoreman yourself? A. Yes, sir.

"Q. How many years of experience have you had in longshoring work? A. About 28 years. * *

"Q. What is this extra board like? A. It is just a board. The men's names are on the outside. Duplicates on the inside. * *

"(Redirect Examination.)

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"Q. But you say you never maintained any black list? A. No, sir, I never have. * *

"Mr. Moulton: Well, have you any authority to maintain a black list at all? A. No, sir, I never heard of a black list since I was in the hall. * *

"Q. (By Mr. Moulton.) On Saturday, in response to a question by Mr. Spencer, you stated that you had no authority to maintain a black list of employees discharged by any of the stevedoring companies. Did you have any authority to maintain a black list at all? A. No, sir, no black list. * *

"Q. Did you ever have authority from the time the hall started, to maintain a black list? * * A. No, sir, no black list was ever maintained.

"Q. Did you not have on your black list M. F. Marks? A. No, sir."

Ralph Johnson, plaintiff herein, testified substantially as follows:

He began working as a longshoreman in about 1922. He was not a member of the regular gang, but worked extra. On Friday, May 29, 1925, he hired out to work for the Oregon Stevedoring Company, one of the defendants herein, which company was unloading the ship "Loch Monar" that was lying in the elevator dock discharging a cargo of cement. The trucks, which they were conveying by hand, were too heavily loaded, and representatives of the gang complained to one R. B. Cochran, a representative of their employer, "that these loads were too heavy, and we would like either to have assistance or else the loads would have to be cut down a little bit more, or else we would not be able to keep it up all day." As to what then took place, he testified:

"Mr. Cochran didn't say a word, but walked over and asked for Mr. Charley Culich, * * and he just said, 'Charley, order a new gang.' Charley went and telephoned for a new gang. * * Then Cochran pulled out his watch and said, 'Well, boys, it is ten thirty.' That meant that we were laid off * * . We went down to the hall and sat around the hall for a while. * * There was six * * . We had been there half an hour when Mr. Cochran came in. He went in

and talked with Jack O'Neil. He and Jack O'Neil were talking there. I don't know what they were talking about. When he left, I went up to the window and I said: 'What did he have to say, Jack?' * * and Mr. O'Neil said, 'Well, boys, I think you are through on the Front. At least that is what he says.' He said, 'I think you are through with the Front.' * * He said, 'The only thing,' he said, 'I think you can fix it up. Go up and have a talk with Cochran, and maybe he will get out of the notion.'"

Plaintiff called upon Powell, the president of the waterfront association, and complained to him that they had been overloaded by the Oregon Stevedoring Company, and that when they protested they had been laid off. Powell was likewise agent of the ship "Loch Monar." He promised plaintiff that he would have a meeting that night and fix it up and let Jack O'Neil know in the morning. This was not done, so plaintiff called upon Powell again the following morning and was sent by him to Captain McDonald, president of the Oregon Stevedoring Company. As to what followed, he testified:

"He (McDonald) said that Mr. Cochran still maintained that we had walked off the job; that we were not laid off. He said when we walked off the job that we were through. * * * I went back to the hall. In the meantime the Silverado was hiring and I had my peg in for work, and I went up to the window (of the hiring hall) * * and I says, 'Fritz (meaning the dispatcher), you forgot to call my name?' And he said, 'You are through, young fellow, until this thing is settled.' * * And I said, 'What do you mean?' * * And he said, * * he shook his head and said, 'No, you fellows can't go to work'; and he pulled out a yellow slip of paper out of his drawer, and he held it up and he read the six of us boys off. * * And he said, 'I have instructions not to give you

fellows a job until you get this thing straightened up.' ''

Plaintiff then called upon O'Neil, who attempted to assist them to settle their differences. O'Neil talked to Powell in their behalf, and, after the interview, said to plaintiff and his companions:

"Well, Johnson, I am afraid you are through. He said for me to kick you fellows out of the hall; for you to keep out of the hall, and if you don't go out, to get the 'bull' and put you out."

Plaintiff testified that he then went to Longview and procured work at street paving, from there to the wheatfields of Eastern Oregon, and thence to the orchards of Hood River Valley.

The testimony of the remaining five of the gang relating to their discharge by Cochran and their removal from the hiring hall is similar to that given by plaintiff.

2, 3. Was the overt act charged in this case the result of a previous conspiracy to blacklist any discharged employee? This is the pivotal point in the case. We have searched the record in vain for express proof that the members of the association ever conspired, confederated or agreed among themselves not to employ any man previously discharged and blacklisted by any one of. them. There is no direct evidence that the co-defendants ever agreed among themselves to any form of blacklisting of their employees. On the other hand O'Neil, the agent in charge of the hiring hall, was placed upon the witness-stand by the plaintiff, and his testimony is to the effect that the defendants never authorized him at any time to blacklist any of the employees. This testimony is not controverted. If it be true that the Oregon Stevedoring Company, Inc., did blacklist the

plaintiff, the direct evidence does not show that this was done pursuant to any previous agreement or confederation with the co-defendants of that corporation. We have previously set out the written agreement and rules of the association. While these writings in no way violate the statute denouncing blacklisting, still, considered in connection with the declarations of the agents of the association when acting in the scope of their authority, they are of material assistance in showing the relation of the several parties hereto. As a general rule, proof of a conspiracy is not by evidence of an express agreement or compact between the alleged conspirators, but is established inferentially or by circumstantial evidence. If these defendants conspired to violate the statute denouncing blacklisting, and entered into a compact to execute such conspiracy, from its very nature that conspiracy was a secret one, and proof thereof could only be gathered from circumstances and inferences from proved facts. On the whole, we are of opinion that the evidence was sufficient to take the case to the jury upon the question as to whether the Oregon Stevedoring Company merely discharged the plaintiff and reported that fact to the hiring hall, or whether that company, pursuant to a prior agreement with its co-defendants, discharged him and accompanied the discharge with a report intended to blacklist him by preventing his future employment. It should be unnecessary to state that this court cannot weigh the evidence or determine the credibility of the witnesses.

4, 5. The act upon which plaintiff bases his cause is entitled:

"An Act to prevent blacklisting of mechanics, unskilled laborers, and other employees."

It provides:

"Sec. 1. No corporation, company, or individual shall blacklist or publish, or cause to be blacklisted or published, any employee, mechanic, or laborer, discharged by such corporation, company, or individual, with intent and for the purpose of preventing such employee, mechanic, or laborer from engaging in or securing similar or other employment from any other corporation, company, or individual.

"Sec. 2. If any officer or agent of any corporation, company, or individual, or other person, shall blacklist or publish, or cause to be blacklisted or published, any employee, mechanic, or laborer, with intent and for the purpose of preventing such employee, mechanic, or laborer from engaging in or securing similar or other employment from any corporation, company, or individual, or shall, in any manner, conspire or contrive, by correspondence or otherwise, to prevent such discharged employee from securing employment, he shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum not less than $50 nor more than $250, or imprisoned in the county jail not less than 30 nor more than 90 days, or both, at the discretion of the court." Gen. Laws Or., 1903, p. 137; codified as Or. L., §§ 2179, 2180.

The defendants assert that the foregoing enactment is unconstitutional and void for uncertainty. There is no merit in this contention. This statute does not offend against Section 1 of the Fourteenth Amendment to the Constitution of the United States by depriving the defendants, or either of them, of their liberty and property without due process of law, nor does it deny to them, or either of them, the equal protection of the law. It makes no attempt to regulate the liberty of the employer, either in the selection or in the discharge of an employee. Moreover, this statute, like the common law, recognizes

the fundamental right of every man to seek employment unhampered by the act of a former employer. Employment for the laboring man means meat and drink; clothing and shelter. The matter of the employment of the laborer in honest toil is pre-eminently of public concern; and public policy requires that his rights shall not be violated. So, with a full realization of the paramount need for protecting the toiler in his honest endeavor to seek a livelihood, a majority of the states of the Union have enacted statutes similar to the one quoted above, denouncing as a crime the blacklisting of employees by a former employer. For a list of such statutes, see compilation of labor laws of the United States by the United States Department of Labor, Bureau of Labor Statistics.

6. As to man's legal right to seek employment unhindered, we quote the following from the treatment of the subject by Judge COOLEY, whose work has long been recognized as the established standard authority on the question:

"It is a part of every man's civil rights that he be left at liberty to refuse business relations with any person whomsoever. * * With his reasons, neither the public nor third persons have any legal concern. It is also his right to have business relations with anyone with whom he can make contracts, and if he is wrongfully deprived of this right by others, he is entitled to redress. Thus, if one is prevented by the wrongful act of a third party from securing some employment he has sought, he suffers a legal wrong, provided he can show that the failure to employ him was the direct and natural consequence of the wrongful act." Cooley on Torts (2 ed.), p. 328.

Under the head of "Malicious Interference With one's Occupation," we find in Webb's Pollock on Torts, at page 406:

"There may be other malicious injuries not capable of more specific definition, 'where a violent or malicious act is done to a man's occupation, profession or way of getting a livelihood.'

"The fundamental right involved in this case is the right of every individual to seek any legal employment he may. One of the aims of the common law has been to protect every person against the wrongful acts of every other person, whether committed alone or in combination with others, and to this end it has provided an action for injuries done by disturbing a person in the enjoyment of any right or privilege which he has. See *Walker* v. *Cronin,* 107 Mass. 562."

In the case of *Mattison* v. *Lake Shore Ry. Co.*, 3 Ohio Dec. 526, 531, PRATT, J., wrote the following pertinent matter relating to the laboring man's right to seek employment:

"It is for the public interest and for the public good that the right of a man to seek his own employment in any honest work which he may seek should not be interfered with or violated. This, of course, does not interfere at all with the right of a company or of a man to judge himself who he will have work for him; and it makes no difference whether he refuses to let a man work for him because he is incompetent, or because he dislikes him; he has a right to seek his employees, but, as is frequently said, one man's right ends where another man's commences, and the right of the employer to discharge ends with his own employment, and he must not trench upon the right of the employee to seek other employment by which he may support himself and his family, and it is for the public interest that the largest liberty to seek employment should be before every man, whatever may be his employment, or whatever may be his business, trade or occupation."

A number of statutes denouncing blacklisting of employees by former employers are collected in a note to 4 L. R. A. (N. S.) 1123; and the editor of the note, in a discussion of the subject of blacklisting, said, among other things:

"The inevitable effect of this practice, when developed on a large scale, must be the subjection of a constantly increasing number of employees to disabilities and restrictions scarcely less oppressive than those to which servants were formerly subjected in England by statutory provisions long since obsolete."

The Minnesota statute prohibiting blacklisting is much like our own, and in the case of *State ex rel. Scheffer* v. *Justus,* 85 Minn. 279 (88 N. W. 759, 89 Am. St. Rep. 550, 56 L. R. A. 757), that statute was held to be constitutional.

7. The defendants say the legislature failed to define the term "blacklisting" as used in the statute. The foregoing statute is a criminal law and must show with reasonable certainty what acts or omissions the legislature intended to prohibit and punish. But reasonable definiteness, in view of conditions, is all that is required: *State* v. *Bailey,* 115 Or. 428 (236 Pac. 1053). The statute assailed is not indefinite. It prohibits any person from blacklisting or publishing any employee with intent and for the purpose of preventing such employee from engaging in or securing similar or other employment, or from conspiring to prevent a discharged employee from securing employment. Some of the older decisions, as do the defendants, complain likewise that the term "blacklisting" is not defined in the dictionaries. That term is found in all modern dictionaries. From Black's Law Dictionary we take the following:

"Black list. A list of persons marked out for special avoidance, antagonism, or enmity on the part of those who prepare the list or those among whom it is intended to circulate."

This definition was quoted with approval in the case of *Dick* v. *Northern Pac. R. Co.*, 86 Wash. 211 (150 Pac. 8, Ann. Cas. 1917A, 638), and appears, in substance, in Webster's New International Dictionary, Funk and Wagnall's Dictionary of the English Language, and in Cogley on Strikes and Lockouts, page 293.

8. The defendants excepted to a number of instructions to the jury, one of which is so manifestly erroneous and prejudicial as to cause a reversal of the judgment in this cause. By this instruction, the jury were charged that they might return a verdict awarding plaintiff both compensatory and punitive damages. Obviously, the trial court failed to recognize the situation of the several defendants. We have heretofore indicated that if the Oregon Stevedoring Company did, in fact, blacklist the plaintiff, the record fails to establish that the co-defendants of that company, with malice, participated in, or previously authorized, or subsequently ratified the acts constituting the alleged blacklisting. Indeed, the friendly offices of O'Neil, the hiring agent, were enlisted to the utmost in an effort to stay the hand of the Oregon Stevedoring Company in the alleged act of blacklisting. But, be that as it may, there is no evidence of record authorizing the recovery of exemplary damages from the co-defendants of the Oregon Stevedoring Company. The testimony fails to show that these co-defendants had any knowledge whatsoever of the difficulty which resulted in the discharge of the plaintiff. From a consideration of the allegations of

the complaint and a careful analysis of the proof offered in support thereof, it is evident that the verdict returned in this case largely represents exemplary damages. This verdict, which is against the eight defendants, is for $4,500.

In the recent case of *Gill* v. *Selling*, decided by this court on May 29, 1928, Mr. Justice BELT, speaking for the court, said:

"Punitive or vindictive damages are assessed on the theory of punishment and as a deterrent effect on others who might commit similar wrongs. Ordinarily the person who has been injured must be content with full and complete compensation. * * The rule was well stated by Mr. Justice STRAHAN in *Day* v. *Holland,* 15 Or. 464 (15 Pac. 858), and cited with approval in *Hamerlynck* v. *Banfield,* 36 Or. 436 (59 Pac. 712), as follows: 'Where a tort is committed with a bad motive, or so recklessly as to imply a disregard of social obligations, and generally when the defendant appears to have done the act wantonly, maliciously, or wickedly, the jury may, in their discretion, give exemplary damages.' "

See, also, list of cases there cited.

In 8 R. C. L., at page 596, appears an interesting discourse on the subject of recovery of exemplary damages; and from the matter there set down we take the following excerpt, which is peculiarly applicable to this case:

"Exemplary damages, if ever recoverable against several defendants, are recoverable only where all are shown to have been moved by a wanton desire to injure; and where more than one person is sued, the malice of one defendant cannot be imputed to another without connecting proof."

9. An intent to injure by preventing future employment is the essence of the offense of blacklisting.

See *Kingsley* v. *United Rys. Co.*, 66 Or. 50 (133 Pac. 785).

By reason of the court's instructions on the question of exemplary damages, this case should be reversed. It is so ordered.                    REVERSED.

RAND, C. J., and BEAN and BELT, JJ., concur in the result.