**Cristin K. GLENN, Plaintiff,**

v.

**DIABETES TREATMENT CENTERS OF AMERICA, INC., Defendant.**

No. CIV. 4–99–CV–30278.

United States District Court,
S.D. Iowa,
Central Division.

Sept. 25, 2000.

**20.** Plaintiff request to contact jurors (Clerk's # 186) is **GRANTED**.

Randy V. Hefner, Alexander R. Rhoads, Hefner Bergkamp & Rhoads PC, Adel, IA, for Cristin K. Glenn, plaintiffs.

Fred L. Morris, Bruce B Graves, Danielle K. Dixon, Brown Winick Graves Gross, Baskerville & Schoenebaum PLC, Des Moines, IA, H. Frederick Humbracht, Jr., Boult Cummings Conner & Berry PLC, Nashville, TN, for Diabetes Treatment Centers of America, Inc.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

WALTERS, Chief United States Magistrate Judge.

This matter is before the Court on defendant's motion for summary judgment

following hearing. Plaintiff Cristin K. Glenn filed a petition in the Iowa District Court for Polk County on April 19, 1999. She brings three causes of action against her former employer, Diabetes Treatment Centers of America, Inc. (DTCA): (1) violation of the Iowa blacklisting law, Iowa Code § 730.1 et seq.; (2) violation of the Iowa Competition Law, Iowa Code § 553.1 et seq.; and (3) a common law claim of tortious interference with a prospective contractual relationship. Defendant removed this action to federal court on May 18, 1999.

Jurisdiction is predicated on 28 U.S.C. §§ 1332(a) and 1441(b). The parties consented to proceed before a United States Magistrate Judge and the case was referred to the undersigned for all further proceedings on October 22, 1999. *See* 28 U.S.C. § 636(c).

## I.

Defendant's motion for summary judgment is subject to the following well-established standards. A party is entitled to summary judgment only when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Helm Financial Corp. v. MNVA Railroad, Inc.*, 212 F.3d 1076, 1080 (8th Cir.2000) (citing Fed. R.Civ.P. 56(c)); *accord Bailey v. U.S.P.S.*, 208 F.3d 652, 654 (8th Cir.2000). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A genuine issue of fact is material if it "might affect the outcome of the suit under governing law." *Hartnagel*, 953 F.2d at 395 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *see Rouse v. Benson*, 193 F.3d 936, 939 (8th Cir.1999).

In assessing a motion for summary judgment a court must determine whether a fair-minded jury could reasonably return a verdict for the nonmoving party based on the evidence presented. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Herring v. Canada Life Assurance Co.*, 207 F.3d 1026, 1030 (8th Cir.2000). The court must view the facts in the light most favorable to the nonmoving party, and give that party the benefit of all reasonable inferences which can be drawn from them. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348; *accord Lambert v. City of Dumas*, 187 F.3d 931, 934 (8th Cir.1999); *Kopp v. Samaritan Health System, Inc.*, 13 F.3d 264, 269 (8th Cir.1993). The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue meriting a trial. *Gremmels v. Tandy Corp.*, 120 F.3d 103, 105 (8th Cir.1997) (citing *Grossman v. Dillard Dep't Stores, Inc.*, 47 F.3d 969, 971 (8th Cir.1995)); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). A conflict in the evidence ordinarily indicates a question of fact to be resolved by the jury. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir.1983).

## II.

Many of the facts are undisputed though the inferences and legal conclusions to be drawn from them are argued by the parties. What follows is a factual summary viewed favorably to plaintiff.

Diabetes Treatment Centers of America, Inc. (DTCA) entered into a three-year written contract with Mercy Hospital Medical Center (Mercy) in May 1994 to develop a diabetes treatment program to be located on the Mercy campus. The diabetes treatment program provided by DTCA consisted of both inpatient and outpatient programs for individuals with diabetes. DTCA employed six individuals, including a program director, program assistant, three dieticians, and a diabetes case manager at the Mercy location.

Plaintiff Cristin K. Glenn commenced her employment with DTCA on or about

February 6, 1996, as a clinical dietician working at the Mercy location. Glenn's employment with DTCA was at-will. It does not appear from the summary judgment record that Glenn signed any type of employment agreement with DTCA.

At the end of the initial three-year contract, Mercy and DTCA agreed to renew and renegotiate the terms of the contract between them. On or about March 14, 1997 DTCA and Mercy entered into an Amended and Restatement Agreement. The new contract extended the term of the contract for an additional five-year period and established revised performance criteria for DTCA. While DTCA continued to manage the program, the new contract provided for additional compensation to DTCA and prohibited each party from recruiting or hiring the other's employees. Specifically, the contract contained a recruitment provision as follows:

Recruitment of Employees:

(A) Hospital and DTCA acknowledge that each party hereto has expended and will continue to expend substantial time, effort and money in training its employees in the development and enhancement of the Hospital's Diabetes Product Line. The employees of each party hereto who will provide the Diabetes Product Line services at Hospital will have access to and possess Confidential Information of DTCA or Hospital. Therefore, DTCA and Hospital mutually agree not to directly or indirectly solicit or hire without prior written approval of the other party during the term of this Agreement any present employee of the other party; provided, however, the Hospital agrees not to directly or indirectly solicit or hire without prior written approval of DTCA during the term of this Agreement and for one year following the expiration, or termination hereof any individual who is employed by DTCA during the term of this agreement as a program man-

ager of Hospital's Diabetes Product Line.

(B) Additionally, during the term of this Agreement Hospital and DTCA mutually agree that in the event of the resignation of any DTCA Specialty Employee of the Employee's Diabetes Product Line, with the exception of the Program Manager, Hospital shall have the option to directly hire any replacement specialty employee, as long as such replacement specialty employee is not the same individual who resigned.

(Ex. C—Amended and Restated Agreement). Under the contract Mercy was prohibited from employing any DTCA employee during the life of the contract. The purpose the recruitment provision was to protect DTCA from Mercy raiding its employees and establishing its own program using DTCA's proprietary practices, procedures, and equipment. Glenn did not see the contract and was unaware of its particulars. (Ex. B, Glenn Depo. at 13).

Although DTCA continued to meet performance goals and criteria under the contract, Mercy requested a modification to it and in June 1998, DTCA prepared a contract amendment, incorporating the changes by Mercy. The amendment was presented to Mercy, but Mercy refused to execute the contract. Subsequently, Mercy declared its dissatisfaction with DTCA's performance, and on or about November 6, 1998, Mercy unilaterally attempted to terminate its contract. At that time Mercy informed DTCA that all DTCA personnel would have to be off Mercy premises by November 10, 1998, including plaintiff Glenn.

DTCA notified its employees that it was still in negotiations with Mercy but that at the close of business on November 6 DTCA would remove itself from Mercy. (Ex. 3, Glenn Depo. at 28). Employees were instructed not to report to work until further notice. (Id.)

Contemporaneously with its attempt to terminate the contract, Mercy filed a law-

suit in the Iowa District Court for Polk County asking the court to declare that it had properly terminated its contract with DTCA. DTCA counterclaimed for damages. It was DTCA's position that Mercy had no right to terminate the contract and that Mercy was in breach by attempting to do so. At the time Mercy owed DTCA $221,000 in past due management fees; $48,000 in performance payments; and approximately $431,000 per year in future payments over the next three and one-half years. DTCA believed Mercy intended to run the diabetes program using what DTCA alleged were its proprietary practices, procedures and equipment.

Throughout November and into mid-December 1998, DTCA negotiated with Mercy in an attempt to settle their disputes and/or renegotiate the contract. Those negotiations included the possibility of a consulting arrangement in which DTCA would provide diabetes consultation to Mercy and DTCA employees would become Mercy employees. By mid-December 1998 negotiations had ceased and it was clear that further attempts to salvage any relationship between DTCA and Mercy would be futile. DTCA explored the possibility of transferring its program to another area hospital. This also proved unavailing.

During the period DTCA was still negotiating with Mercy, it continued to pay its employees, including Glenn. Glenn, however, did not perform any job functions for DTCA or Mercy. On December 21, 1998, DTCA informed its employees that their last day of work with DTCA had been Wednesday, November 11, 1998 and DTCA would be forced to terminate their employment effective December 31, 1998. Glenn was paid through December 31 and was provided a severance package through January 1999.

The Executive Associate for Operations at Mercy, Jean Doerge, has testified that following the termination of the DTCA–Mercy contract, Mercy intended to employ DTCA personnel who had worked in the program. (Ex. 4, Doerge Depo. at 22).

Doerge had been directed to obtain written or verbal permission from DTCA prior to interviewing and hiring former employees of DTCA. (Id. at 24). She received conflicting information that DTCA had told its employees it would not prohibit them from seeking employment with Mercy, but also that DTCA had instructed Mercy should not contact its employees. (Id. at 29; Ex. 5). Mercy's counsel also contacted DTCA and informed it of Mercy's willingness to hire DTCA's employees and requested approval to do so. (Ex. 1). Approval was not forthcoming and late in November and early December 1998 DTCA incorporated a waiver of the recruitment provision as a part of its proposed settlement of their dispute.

On November 13, 1998, a "Clinical Dietitian" position specifically related to diabetes care and treatment was posted at Mercy. (Ex. 4, Doerge Depo. Ex. 2). Glenn was one of four employees who applied for the position on or about November 20, 1998. (Ex. 4, Doerge Depo. at 39). Mercy had a need for diabetes educators and persons with Glenn's skill, and was interested in securing "open access" for Glenn and the other DTCA employees to Mercy's employment opportunities. (Id. at 77–79). The reason Mercy did not hire former DTCA employees, including Glenn, was because of the recruitment provision in the contract between DTCA and Mercy. (Id. at 71).

In his affidavit DTCA regional vice-president Scott Sivik states that at no time in November or December 1998 did he tell Glenn that she was prohibited or constrained from resigning her position with DTCA to become employed by Mercy. (Ex. A, Sivik Aff. ¶ 16). Glenn has testified, however, that when he first announced DTCA was vacating Mercy, Sivik, in response to a question from Glenn about whether they would be able to work for Mercy if DTCA and Mercy did not straighten out their difficulties, responded that he would not prevent them from working for Mercy but he preferred they

did not pursue employment with Mercy, stating he was working on getting their jobs back. (Ex. B, Glenn Depo. at 29). Later, when the dietician job opening was posted, Sivik told Glenn that he would not release her to take the job. (Ex. 3, Glenn Depo. at 45–48).

On December 24, 1998 Mercy wrote Glenn that it had received no new information from DTCA that "would allow us to proceed with employment at Mercy." (Ex. 6). Ultimately, Mercy hired a non-DTCA person, Joanie Rainforth, for the position for which Glenn applied. (Ex. 4, Doerge Depo. at 51). Glenn had more relevant experience than Rainforth and was qualified for the job. (*Id.* at 60–61,81).

## III.

Glenn's claims, in their various forms, ultimately come down to the issue of whether DTCA unlawfully prevented her from obtaining employment with Mercy.

### A. *Blacklisting*

Glenn's first claim is that DTCA violated the Iowa statute prohibiting blacklisting. She relies on Iowa Code §§ 730.1 and 730.2 which provide:

**730.1 Punishment.**

If any person, agent, company, or corporation, after having discharged any employee from service, shall prevent or attempt to prevent, by word or writing of any kind, such discharged employee from obtaining employment with any other person, company, or corporation, except by furnishing in writing on request a truthful statement as to the cause of the person's discharge, such person, agent, company, or corporation shall be guilty of a serious misdemeanor and shall be liable for all damages sustained by any such person.

**730.2 Blacklisting employees—treble damages.**

If any railway company or other company, partnership, or corporation shall authorize or allow any of its or their agents to blacklist any discharged employee, or attempt by word or writing or any other means whatever to prevent such discharged employee, or any employee who may have voluntarily left said company's service, from obtaining employment with any other person or company, except as provided for in section 730.1, such company or copartnership shall be liable in treble damages to such employee so prevented from obtaining employment.

The Iowa blacklisting law was enacted in 1888 and first codified in McClain's Code 1888 at §§ 5429–30. *See* Acts 1888 (22 G.A.) ch. 57, § 1. It has been little amended since. There are no reported Iowa cases which discuss the statute substantively. In *French v. Foods, Inc.*, 495 N.W.2d 768 (Iowa 1993), the Iowa Supreme Court, referring to a related provision in chapter 730, observed simply that the statute "involves blacklisting an employee with a potential future employer." *Id.* at 772. Statutes of this type, which many states have,[1] came about in the late nineteenth century in response to the practice of certain railroads of "blacklisting" union organizers and union members. *See Bridgestone/Firestone, Inc. v. Lockhart*, 5 F.Supp.2d 667, 686 (S.D.Ind.1998). As in Iowa, blacklisting laws have attracted very little attention from appellate courts elsewhere.

■ There is not much to guide the Court beyond the language of the statutory provisions (which must be considered together) and their evident purpose, but the elements of a civil action for blacklisting nonetheless seem apparent. In this case plaintiff must prove: (1) the defendant discharged plaintiff; (2) thereafter, by word, writing or other means the defendant prevented or attempted to prevent the plaintiff from obtaining other employment; (3) defendant acted with the pre-

---

1. The state statutory provisions are listed in 48 Am.Jur.2d *Labor and Labor Relations* § 669 at 422.23.

dominant purpose of preventing plaintiff from obtaining future employment; and (4) defendant's conduct was a proximate cause of damage to plaintiff. The first, second and fourth elements find expression in the statutory language. The third, that defendant must have acted with the purpose of preventing Glenn from working, is implicit from the statutory language, necessary to focus the law on the wrong it addresses, and is supported by rules of statutory construction.

■ First, by its nature blacklisting is purposeful conduct intended to punish the victim. *See Black's Law Dictionary* 7th Ed. (defining "blacklist" as placement of a person's name "on a list of those who are to be boycotted or punished"). "An intent to injure by preventing future employment is the essence of the offense of blacklisting." *State v. Dabney,* 77 Okla.Crim. 331, 141 P.2d 303, 308 (Okla.Crim.App.1943); *see Johnson v. Oregon Stevedoring Co.,* 128 Or. 121, 270 P. 772, 777 (1928); 48 Am.Jur.2d *Labor and Labor Relations* § 669 at 422 (blacklisting is the publication of the name of a former employee "with the intent of preventing the employee from securing employment elsewhere"). Second, § 730.1 is a criminal statute and, ordinarily, criminal statutes are strictly construed. *State v. Pace,* 602 N.W.2d 764, 771 (Iowa 1999). On the civil side, while the blacklisting law provides a remedy in damages, it also imposes a penalty by trebling them, which implies that the statute is directed at intentional misconduct. Intent is also implicit in the statutory language describing the wrong as words or writing to "prevent or attempt to prevent ... employment." Iowa Code § 730.1. One does not ordinarily prevent or attempt to prevent something unintentionally. An attempt means to try to do something. *See* Ia.Crim. J.I. 200.18. Finally, without the element of intent, a former employer could conceivably be exposed to treble damages for a mistake in providing information about a former employee to a prospective employer. Such a result would stray from the original purpose of the law. It is very unlikely the Iowa Supreme Court after all these years would give an expansive construction of the blacklisting law beyond what is commonly understood to constitute blacklisting.

■ Glenn contends there is a factual issue about when she was discharged, and argues she ceased to be an employee after November 6, 1998, because she performed no work for DTCA after DTCA left Mercy on that date. DTCA's refusal after November 6 to release Mercy from the recruitment provision so it could hire her thus amounted to blacklisting. In the Court's judgment, the temporal issue is determined not with reference to the point in time Glenn ceased to be an "employee" under the traditional hornbook concepts, (though the Court is inclined to believe she did remain an employee after November 6 since DTCA continued to pay her and could have assigned work to her), but rather, the point at which DTCA acted to end the employment relationship. An employment discharge is a termination of employment by the employer. The employer's intent is controlling. Reasonable jurors could not find plaintiff's discharge occurred prior to December 21, 1998, the date on which DTCA informed its employees that their employment would end effective December 31, 1998. Before then DTCA was attempting to salvage some type of relationship with Mercy or negotiate a termination of their relationship, and maintained its staff in order to further these objectives. Glenn complains, not without reason, that she and other employees were used as bargaining chips with Mercy. But to be a bargaining chip for DTCA Glenn had to be a DTCA employee. DTCA's reluctance to approve Glenn's employment with Mercy and settlement proposals to Mercy between November 6 and December 21, 1998 are consistent with an intent by it to hold on to Glenn as an employee and inconsistent with the idea that DTCA had discharged her.

The record does not reflect any postdischarge words, writing or other conduct by DTCA which the jury could conclude

were for the purpose of preventing Glenn from obtaining employment with Mercy or elsewhere. The summary judgment record reflects only that on December 24, 1998, Mercy wrote Glenn it had received no new information from DTCA that would permit it to employ her. The blacklisting law did not impose an affirmative duty on DTCA to provide information. Moreover, by December 24 Glenn knew that she would soon be discharged and could have so informed Mercy. The recruitment provision in the contract between Mercy and DTCA did not prohibit Mercy from hiring discharged employees of DTCA.

For the reasons indicated, the motion for summary judgment will be granted on Glenn's blacklisting claim.

## B. *Iowa Competition Law*

■ Plaintiff's second cause of action against DTCA is based on a violation of the Iowa Competition Law. That statute provides "[a] contract, combination, or conspiracy between two or more persons shall not restrain or monopolize trade or commerce in a relevant market." Iowa Code § 553.4. The statute is to be construed "to complement and be harmonized with" the antitrust laws of the United States. *Id.* § 553.2. Glenn notes that the Iowa Supreme Court has upheld covenants not to compete between an employee and employer if reasonable in duration and geographic area, and argues the fact the employee is not a party to a covenant not to hire or recruit like that here should make the covenant per se unreasonable or subject to a presumption of unreasonableness.

■ The typical covenant not to compete in an employment contract is a contract in restraint of trade. *See Lemmon v. Hendrickson,* 559 N.W.2d 278, 282 (Iowa 1997) (to require former employee "may never solicit former customers constitutes an unreasonable restraint of competition"); *Iowa Glass Depot, Inc. v. Jindrich,* 338 N.W.2d 376, 381 (Iowa 1983) (outlining factors to consider in determining whether "noncompetitive agreement is unreasonably in restraint of trade"); *Cogley Clinic v. Martini,* 253 Iowa 541, 546, 112 N.W.2d 678, 681 (1962) (restrictive covenants of employment "are in partial restraint of trade and are approved with some reluctance"); *Brecher v. Brown,* 235 Iowa 627, 630–31, 17 N.W.2d 377, 379 (1945) (recognizing covenant not to compete is a restraint of trade). It is enforced so long as the covenant does not unreasonably restrain trade. "Covenants not to compete are unreasonably restrictive unless they are tightly limited as to both time and area." *Lemmon,* 559 N.W.2d at 282; *see Revere Transducers, Inc. v. Deere & Co.,* 595 N.W.2d 751, 761 (Iowa 1999).

The covenant in the contract between DTCA and Mercy differs from a covenant not to compete in two important respects. First, as Glenn notes, she was not a party to it. She did not agree that she would not go to work for Mercy. However, though unreasonable to her for this reason, the fact Glenn was not a party to the covenant does not make it more or less of a restraint of trade. Second, the covenant is what the Iowa Supreme Court has referred to as an "anti-raiding provision." *Pathology Consultants v. Gratton,* 343 N.W.2d 428, 434 (Iowa 1984). The language in the covenant not to hire or recruit between DTCA and Mercy clearly indicates the intent of the provision was to restrict each party from picking off the employees of the other. An anti-raiding provision is not subject to the same strict time and geographic area limitations as a covenant not to compete. *Id.* It follows that the provision is not per se unreasonable nor subject to any presumption of unreasonableness as Glenn argues.

■ The reasonableness of the restraint is to be determined with reference to general principles. Iowa has adopted the "rule of reason" standard applied by the United States Supreme Court in cases under the Sherman Act, 15 U.S.C. § 1, et seq. as articulated in *Bd. of Trade of City of Chicago v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918). *State v. Cedar Rapids Bd. of Realtors,* 300 N.W.2d

127, 128 (Iowa 1981). Reasonableness requires an examination of

> [t]he facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained. . . .

*Id.* (quoting *Bd. of Trade of City of Chicago,* 246 U.S. at 238, 38 S.Ct. 242). The balancing of the factors which go into the assessment of reasonableness is normally for the jury. *American Ad Management, Inc. v. GTE Corp.,* 92 F.3d 781, 791 (9th Cir.1996); *see Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) ("the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition").

Beyond the justification for the anti-raiding provision, none of the relevant factors are addressed in the summary judgment record. As a result, the Court cannot conclude genuine issues of material fact are lacking and that the provision was reasonable as a matter of law. Accordingly, the motion for summary judgment will be denied with respect to the Iowa Competition Law claim.[2]

### C. *Tortious Interference with Prospective Contractual Relation*

 Plaintiff's final claim is that DTCA intentionally interfered with her prospective contractual relationship with Mercy. To recover on this claim, plaintiff must prove (1) the existence of a prospective contractual relationship; (2) DTCA's knowledge of that prospective relationship; (3) DTCA's intentional and improper interference with that relationship; (4) that the interference caused the relationship to fail to materialize and (5) damages. *Preferred Marketing Associates Co. v. Hawkeye National Life Ins. Co.,* 452 N.W.2d 389, 396 (Iowa 1990). Intent under this theory incorporates a requirement that DTCA acted "with the sole or predominant purpose to injure or financially destroy the plaintiff." *Compiano v. Hawkeye Bank & Trust of Des Moines,* 588 N.W.2d 462, 466 (Iowa 1999); *Financial Marketing Services, Inc. v. Hawkeye Bank & Trust of Des Moines,* 588 N.W.2d 450, 459 (Iowa 1999).

As the arguments at hearing on the summary judgment motion indicate, there is no evidence in the summary judgment record which could lead a reasonable factfinder to conclude that DTCA acted with the sole or predominant purpose to financially injure or destroy plaintiff. The motion for summary judgment will be granted on this claim.

### IV.

For the foregoing reasons, defendant's motion is denied in part and granted in part. The motion is granted with respect to plaintiff's claims under the Iowa blacklisting statute and for tortious interference with a prospective contractual relationship. The motion is denied with respect to the

---

**2.** DTCA takes a narrow view of the anti-raiding provision in this litigation, and contends that since the contract only prevented Mercy from recruiting "present" DTCA employees, Glenn could have quit and gone to work for Mercy. Therefore, DTCA argues, the contract was not a cause in fact of Glenn's inability to obtain employment with Mercy. The Court believes causation is a disputed factual issue. In November and December 1998 Mercy had asked for permission to hire the DTCA employees. DTCA did not give permission, but in its communications with Mercy reserved the issue as a negotiating point. Mercy and DTCA were in litigation at the time. It is by no means clear that DTCA at that time interpreted the anti-raiding provision as it does now and the provision is not without ambiguity as it relates to an employee who resigns in order to take employment with Mercy. In the circumstances as they then existed, the jury could find that as a practical matter the anti-raiding provision was a reason Mercy did not offer her a job.

Iowa Competition Law claim. Trial remains as previously set.

IT IS SO ORDERED.