# STATE v. C. B. DABNEY.

No. A-9973.   Sept. 15, 1943.

(141 P. 2d 303.)

332

Mac Q. Williamson, Atty. Gen., and P. C. Lackey and J. Walker Field, Asst. Attys. Gen., for plaintiff in error.

S. E. Dunn, of Tulsa, for defendant in error.

JONES, P. J. The defendant, C. B. Dabney, was charged in the court of common pleas of Tulsa county, by information, with the crime of blacklisting. The information alleged that the defendant "did unlawfully, wilfully, maliciously and knowingly blacklist one Alize Gray in way and manner as follows: He, the said C. B. Dabney, then and there was the Business Manager of the Commercial Business College, located at 117 South Birmingham Avenue, in the city of Tulsa, Oklahoma, and that on the 2nd day of June, 1940, one Alize Gray entered said business college as an apprentice instructor in said institution and remained in said institution as said instructor for something like two weeks, when she, the said Alize Gray voluntarily resigned as apprentice instructor in said institution of her own free will, and shortly thereafter she, the said Alize Gray, secured employment at S. H. Kress & Company, a corporation, at the lunch counter, and thereafter, to-wit: On the 15th day of August, 1940, in order to blacklist and cause her,

the said Alize Gray, to lose her job, the said defendant wrote a letter to the manager of the S. H. Kress & Company, a corporation, in which he stated that she was a trouble-maker and that she, the said Alize Gray, also made trouble in his organization, and a true and correct copy of said letter is hereto attached and made a part of this information, and said letter was written and mailed to the S. H. Kress & Company at their address in the city of Tulsa, Okla., for the purpose of blacklisting and causing her, the said Alize Gray to lose her job in said institution, contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the state."

Attached to the information was a letter allegedly written by defendant which reads:

"C. B. Dabney,
"Business Manager

"Assistant Instructors Margaret Miller
"Ruth Edmonds

"Commercial Business College
"Tulsa, Oklahoma, August 15, 1940

"Manager,
"S. H. Kress & Company,
"Tulsa, Oklahoma

"Dear Sir:

"About twenty five years ago your company gave my first start when my school days were over. In August, 1916, I made my first trip to the Navy Recruiting Station at Muskogee, Oklahoma. I was sixteen years of age at that time and would be seventeen on the 11th day of November. It had always been my boyhood ambition to join the Navy the day that I became old enough and I wanted to see if the recruiting officer could give me any idea as to my ability to pass the examination. He informed me that I was seven pounds under weight and a

little flat footed but he said that if I could gain the weight necessary, I could practice humping up my arches and maybe fool him when I came back. He told me that the best way to gain weight would be to get a job at some soda fountain where I could eat enough ice cream to make up the shortage in weight and suggested that I go over to Kress' and put in my application, and this I did. I was working within three weeks. On my birthday, I passed the examinations and was soon on my way. When I think of it now, it was a stinky trick. I wasn't underfed and my father could have purchased the necessary ice cream for me but I never thought of that. I took the first suggestion but never-the-less I'm still grateful. The unsolicited favour and the only one which I have ever been able to offer in return for the one received may not be appreciated but at least I have the best of intentions.

"At one of the lunch counters in your basement, I see a girl by the name of Alize Gray. I do not know if she is listed with you by that name or not but I can furnish photo upon request. On June 2nd of this year she entered this institution on the pretense of being an apprentice instructor. A few days later my suspicions were aroused by numerous questions regarding other help in this school and who each and every student was. When I came about she was nearly always engaged in confidential conversation with others. On June 13th some of the other help informed me that she had told them that she was being paid as an investigator by the Better Business Bureau to find all that she could about our business. I held a meeting a day or so later in which she was invited to sit. It was a very business like meeting and a few days later she resigned of her own free will after I made a trip to the police station and consulted Mr. Blaine, Chief of Detectives, at which time he called the Bureau regarding the matter. The Bureau denied the accusation but from the many things which had happened, I am still of the opinion that she was telling the truth. Just after the meeting in which she was invited to sit she threatened

with a good beating up of all that she had informed as to her two way position.

"I do not know if your company subscribes to the Better Business Bureau or not but for your information, I have enclosed some information about them. You may obtain one of these fifteen page booklets from the Bureau of Records without charge, by writing for a copy of decisions handed down by Congress in 1933 regarding the Bureaus and their rackets.

"This girl kept trouble brewing in the organization practically all of the time that she was here and while I have no intentions of inferring that she may be a trouble maker in your organization, I realize that I was fortunate to have had so many loyal persons here.

"Trusting that you will receive this letter in the spirit in which it was written, I am,

"Yours very truly,
"(Signed) C. B. Dabney,
"1117 South Birmingham Ave."

A demurrer was filed by the defendant to the information alleging that the same fails to state a cause of action against defendant. The demurrer was sustained and defendant discharged. The state excepted to the action of the court and this appeal was filed by the state.

40 O. S. 1941 §§ 172 and 173 provide:

"No firm, corporation or individual shall blacklist or require a letter of relinquishment, or publish, or cause to be published, or blacklisted, any employe, mechanic or laborer, discharged from or voluntarily leaving the service of such company, corporation or individual, with intent and for the purpose of preventing such employe, mechanic or laborer, from engaging in or securing similar or other employment from any other corporation, company or individual.

"Any person, firm or corporation violating the preceding section shall be fined in any sum not less than

one-hundred dollars, nor more than five hundred dollars, and any person so blacklisted shall have a right of action to recover damages."

These statutes were adopted by the Territorial Legislature in 1897 and they exist today as a part of our Code without any change having been made since their original enactment by the Territorial Legislature. In the 50 years since its adoption, no appellate court of this state has had occasion to interpret this statute.

Most of the states of the Union have enacted similar statutes. Some of these states, with a citation of their respective statutes, are set forth in a note following the opinion in the case of Wabash R. Co. v. Young, 4 L.R.A., N.S., 1091, 1123.

So far as the citations of authorities contained in the respective briefs of the parties filed herein and the research of this court have disclosed, all of the states in which the validity of a similar statute has been attacked have sustained its constitutionality. See State ex rel. Scheffer v. Justus, 85 Minn. 279, 88 N.W. 759, 56 L.R.A. 757, 89 Am. St. Rep. 550; Johnson v. Oregon Stevedoring Co., 128 Or. 121, 270 P. 772; Mattison v. Lake Shore & M. S. Ry. Co., 3 Ohio Dec. 526; Dick v. Northern Pac. Ry. Co., 86 Wash. 211, 150 P. 8, Ann. Cas. 1917A, 638; 11 C.J.S., Blacklist, p. 354.

In Mattison v. Lake Shore & M. S. Ry. Co., supra, it is stated:

"It is for the public interest and for the public good that the right of a man to seek his own employment in any honest work which he may seek, should not be interfered with or violated. This, of course, does not interfere at all with the right of a company, or of a man, to judge himself who he will have work for him; and it makes no difference whether he refuses to let a man

work for him because he is incompetent or because he dislikes him; he has a right to seek his employees, but, as is frequently said, one man's right ends where another man's commences, and the right of the employer to discharge ends with his own employment, and he must not trench upon the right of the employee to seek other employment by which he may support himself and his family, and it is for the public interest that the largest liberty to seek employment should be before every man whatever may be his employment, or whatever may be his business, trade or occupation."

Counsel for defendant cites only one case, which was a decision by the Supreme Court of Oklahoma in the case of Chicago, R. I. & P. R. Co. et al. v. Medley, 55 Okla. 145, 155 P. 211, L.R.A. 1916D, 587. The Supreme Court did not consider the statute on blacklisting, hereinabove quoted, in that case, but merely determined that a service letter issued by a railroad company to its former employee was not libelous on its face. The suit was an action for damages for libel brought by Medley against the railroad company for issuance and publication of a false service letter. We have carefully read this case and have found no language in it which might assist us in an interpretation of the statute herein involved.

Our first consideration is whether the term "blacklist," as used in the statute, not being defined by the Legislature, is too indefinite to show with reasonable certainty what acts or omissions the Legislature intended to punish. The statute provides that:

"No firm * * * shall blacklist * * * any employe * * * discharged from or voluntarily leaving * * * with intent and for the purpose of preventing such employe * * * from * * * securing * * * other employment."

In Black's Law Dictionary (3rd Ed.) the term "blacklist" is defined:

"A list of persons marked out for special avoidance, antagonism, or enmity on the part of those who prepare the list or those among whom it is intended to circulate; as where a trades-union 'blacklists' workmen who refuse to conform to its rules, or where a list of insolvent or untrustworthy persons is published by a commercial agency or mercantile association."

Webster defines the term:

"A list of individuals regarded as suspect or as deserving of censure or adverse discrimination."

These definitions, or ones very similar, were quoted with approval in Johnson v. Oregon Stevedoring Co., supra, and Dick v. Northern Pac. R. Co., supra. A similar definition of "blacklisting" will be found in all modern dictionaries. We must conclude, therefore, that the term "blacklist" has a well-defined meaning.

In State v. Barnett, 60 Okla. Cr. 355, 69 P. 2d 77, 78, it is held:

"Where the language of a statute is unambiguous and its meaning is evident, it must be held to mean what it plainly expresses, and no room is left for the application of rules of construction and interpretation.

"A court in determining what acts may be punished under a statute must apply the rule that the terms of a penal statute must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties.

"A penal statute is sufficiently certain, although it may use general terms, if the offense is so defined as to convey to a person of ordinary intelligence what acts are prohibited."

In the body of the opinion it is stated:

"It is a well-settled rule that a penal statute must be construed with such strictness as to carefully guard

the rights of the accused, and at the same time preserve the obvious intention of the Legislature; what the legislative intention was, however, can be derived only from the words used in the statute. State v. Young, 20 Okla. Cr. 383, 203 P. 484.

"In Kepner v. United States, 195 U. S. 100, 24 S. Ct. 797, 802, 49 L. Ed. 114, 1 Ann. Cas. 655, it is said:

" 'It is a well-settled rule of construction that language used in a statute which has a settled and well-known meaning, sanctioned by judicial decision, is presumed to be used in that sense by the legislative body.' "

In the case of Groskins v. State, 52 Okla. Cr. 197, 4 P. 2d 117, this court held:

"A penal statute is sufficiently certain, although it may use general terms, if the offense is so defined as to convey to a person of ordinary intelligence an adequate description of the evil intended to be prohibited."

In 4 L.R.A., N.S., 1123, note, supra, it is stated:

"It is manifest that, if the practice of 'blacklisting' is permitted to go on unchecked, the employers of our own times will be able, by private compacts, to place large bodies of employees in a position analogous to that which would result from the operation of such a statute, and to which they are still subjected by the laws of some of the countries of continental Europe. A passport system of the kind has always been found to be productive of serious evils, even when it is worked by public officials, and it must be immeasurably more dangerous to leave in the hands of private parties so formidable an instrument of potential tyranny, capable of being used, and, as human nature is constituted, certain to be used, in many instances, as a means of gratifying personal animosity or class hatred."

In State ex rel. Scheffer v. Justus, supra [85 Minn. 279, 88 NW. 760, 56 L.R.A. 757, 89 Am. St. Rep. 550], it is stated:

340

"Again, it is insisted that an employer of labor has the natural right, under the Constitution, state and federal, to give such advice and information as he desires with respect to his employes, whether they have been discharged for cause or without cause, or whether they have voluntarily left the employment. This leads to a consideration of what the offense is, as set forth by the provisions of section 2. An employe who voluntarily leaves his employment is one who has the right to do so. He violates no contract obligations. Presumably, he is an employe in good standing, and leaves because it is to his advantage so to do; and if he seeks employment elsewhere he is entitled to the presumption that his reputation as an employe has been unharmed by the fact of his leaving. The fact that such an employe voluntarily abandons his employment does not give the employer a right to prejudice his employment elsewhere. Under such circumstances, a communication designed to prevent such employment is presumably a reflection upon the standing of the employe. It is no answer to say that the employer may have cause for making such communication; that it may be to the advantage of the new employer, and for the mutual advantage of all such employers, to have notice of the character of the employe. If there is any valid reason for such communication, it would be available only as a matter of defense. The act does not attempt to interfere with the right of an employer to discharge an employe for cause or without cause. It does not seek to prohibit an employer from communicating to other employers the nature and character of his employes, when the facts would be for their interests. While such interference by an employer is not expressly characterized as malicious, that intent is necessarily implied. It is the purpose of this law to protect employes in the enjoyment of those natural rights and privileges guaranteed them by the Constitution, viz., the right to sell their labor and acquire property thereby."

Although the statute itself is not attacked by defendant, the above authorities abundantly sustain its validity.

With the validity of the statute established, we must next consider the allegations of the information to see whether they are sufficient to charge an offense under the terms of the said statute. The allegations of the information follow the wording of the statute in that they allege that defendant did unlawfully blacklist one Alize Gray. It further alleges that the said Gray was employed by defendant in the business college for approximately two weeks, when she voluntarily resigned and secured employment at another company and that defendant, in order to blacklist and cause her to lose her job, did write a certain letter to said company stating that she was a trouble-maker and had made trouble in his organization, all of which was done for the purpose of blacklisting and causing her, the said Alize Gray, to lose her job.

An intent to injure by preventing future employment is the essence of the offense of blacklisting. The allegations of the information and the letter attached are sufficient to come within the prohibition of the statute. The letter plainly states that the said Gray was employed by a bureau which was conducting a racket and stirring up trouble in certain organizations. It plainly infers that the said Gray is such a person as would probably be a source of trouble in any organization by whom she may be employed.

It should be understood that we are here only passing upon the sufficiency of the allegations of the information. Whether defendant actually wrote the letter, his good faith in writing the same, and whether he had any intent to injure the said Gray by preventing future employment, are questions of fact to be determined by a jury. If the allegations of the information are correct, the letter which was written is apparently just such an act at which the statute is directed.

Although the words used in the letter allegedly written by defendant are not libelous per se, they are sufficient, when considered with the allegations of the information, to bring the alleged act of defendant within the terms of the statute. The statute herein involved does not purport to specify the kind of words which must be used in blacklisting an individual. The libel statute, 21 O. S. 1941 § 771, construed by our Supreme Court in the Medley Case, supra, cited and relied on by defendant, requires that the publication be such as exposes the person to public hatred, contempt, ridicule or obloquy, or which tends to deprive him of public confidence, or to injure him in his occupation. All that is required under the statute here under consideration is that the former employer blacklist a former employee with the intent and for the purpose of preventing such former employee from thereafter obtaining work. While the words that may be used may not be such as subject said former employee to public hatred, ridicule or obloquy, if they are such as to show that they were published with the intent of injuring such former employee in her seeking to obtain work, then they are sufficient under the terms of the statute.

For the reasons hereinabove stated, the judgment of the court of common pleas of Tulsa county sustaining a demurrer to the information filed herein is reversed and said case remanded for further proceedings consistent with the views expressed in this opinion.

BAREFOOT, J., concurs. DOYLE, J., absent and not participating.