ATTORNEYS FOR PLAINTIFF/COUNTER-DEFENDANT
Craig W. Wiley
Michael W. Padgett
Indianapolis, Indiana

Robin K. Vinson
Raleigh, North Carolina

Charles W. Pautsch
Milwaukee, Wisconsin

ATTORNEYS FOR DEFENDANTS/COUNTER-PLAINTIFFS
Donald E. Knebel
Lynn C. Tyler
Aaron M. Staser
Jennifer L. Schuster
Indianapolis, Indiana

FILED

Mar 21 2012, 4:13 pm

CLERK
of the supreme court,
court of appeals and
tax court



# In the
# Indiana Supreme Court

No. 94S00-1109-CQ-546

LOPAREX, LLC,

*Plaintiff/Counter-Defendant,*

v.

MPI RELEASE TECHNOLOGIES, LLC,
GERALD KERBER, AND STEPHEN ODDERS,

*Defendants/Counter-Plaintiffs.*

Certified Question from the United States District Court for the Southern District of Indiana
No. 1:09-CV-01411-JMS-AB
The Honorable Jane E. Magnus-Stinson, Judge

**March 21, 2012**

**Shepard, Chief Justice.**

Just over a century ago, in <u>Wabash Railroad Co. v. Young</u>, this Court held that Indiana's Blacklisting Statute violated the constitutional Single Subject requirement. We therefore held the statute did not provide a cause of action to individuals who voluntarily leave their employment. Since then, the people have revised this constitutional requirement, and our standards for its application have evolved, casting continued reliance on <u>Young</u> into doubt.

The vitality of Young and other questions related to the scope of the Blacklisting Statute are now before us by virtue of a certified question from the U.S. District Court for the Southern District of Indiana. Pursuant to Indiana Appellate Rule 64, Judge Jane Magnus-Stinson has certified the following questions:

>1. Is Wabash Railroad Co. v. Young, 162 Ind. 102, 69 N.E. 1003 (1904), still good law, such that individuals who voluntarily leave employment are precluded from pursuing a claim under Indiana's Blacklisting Statute?
>
>2. In an action brought under Indiana's Blacklisting Statute, are attorney fees incurred in defending an unsuccessful claim against a former employee or in prosecuting a claim by a former employee recoverable as compensatory damages?
>
>3. Is an unsuccessful suit to protect alleged trade secrets, within which a former employer seeks to preclude any competitive employment of a former employee by pursuing permanent injunctive relief and in settlement negotiations, a basis for recovery under Indiana's Blacklisting Statute?

We respond as follows: (1) Young is no longer good law and individuals who voluntarily leave employment are not barred from making a claim under Indiana's Blacklisting Statute; (2) attorney fees are not an element of compensatory damages under the Blacklisting Statute; and (3) an employer's suit against a former employee to protect trade secrets is not a basis for recovery under the Blacklisting Statute.

**Background**

Stephan Odders and Gerald Kerber[1] are former employees of Loparex, LLC, a corporation in the "release liner" industry.[2] During their employment, Odders and Kerber gained in-depth knowledge of Loparex's sales practices, strategies, and client information, as well as technical information about its formulas, production processes, and proprietary machinery.

Loparex fired Odders in September 2008. Odders was then subject to a one-year noncompetition agreement forbidding him from soliciting Loparex customers or working for a competitor within certain territorial limits. Loparex alleges that during that one year, Odders met on multiple occasions with representatives of MPI Release Technologies, LLC,[3] a competitor in the release liner industry. Loparex alleges these meetings were inconsistent with the restrictions of its noncompetition agreement. Odders began a new job with MPI in September 2009.

Kerber resigned from Loparex in September 2009 and immediately began employment with MPI, though he was also subject to a similar one-year agreement. Loparex alleges that Kerber took notebooks and digital memory devices with him. Loparex apparently believed these items contained trade secrets, although that does not appear to have been confirmed.

In October 2009, Loparex sued Kerber in Illinois state court, seeking injunctive relief under the Illinois Trade Secrets Act and damages resulting from Kerber's breach of the

---

[1] Though Kerber and Odders are technically the counterplaintiffs in their blacklisting claim, for simplicity we refer to them here as the Defendants.

[2] The release liner industry involves products such as nametags with peel-off backings, window films, and roofing underlayment. The particular formulas involved in these products are apparently closely guarded trade secrets.

[3] MPI Release Technologies, Inc., while a defendant in the original case, is not a counterplaintiff in the blacklisting claim.

noncompetition agreement. Loparex dismissed that suit and re-filed in the U.S. District Court for the Southern District of Indiana in November 2009. This time, Loparex included claims against Odders but still sought both injunctive relief and damages. At the same time, Loparex sought to enjoin MPI from employing Kerber and Odders, a request later withdrawn. On several occasions, Loparex apparently offered to dismiss its suit if MPI agreed to terminate the employment of Kerber and Odders. Loparex had sent cease and desist letters to Kerber and Odders before filing its lawsuits.

In April 2010, Kerber and Odders filed amended answers and counterclaims accusing Loparex of blacklisting in violation of Indiana law. The counterclaims seek damages including, among other things, the attorney fees Kerber and Odders incurred in defending themselves against Loparex's litigation. Judge Magnus-Stinson certified these questions to us in September 2011, after she denied Loparex's motions to dismiss the counterclaims and granted summary judgment to Kerber and Odders on Loparex's claims.

**Indiana's Blacklisting Statute**

The relevant portion of the Blacklisting Statute, a provision creating a cause of action for damages resulting from a former employer engaging in blacklisting, provides:

> If any railway company or any other company, partnership, limited liability company, or corporation in this state shall authorize, allow or permit any of its or their agents to black-list any discharged employees, or attempt by words or writing, or any other means whatever, to prevent such discharged employee, or any employee who may have voluntarily left said company's service, from obtaining employment with any other person, or company, said company shall be liable to such employee in such sum as will fully compensate him, to which may be added exemplary damages.

Ind. Code § 22-5-3-2 (2007).

4

Like other states' blacklisting statutes, Indiana's was enacted around the turn of the twentieth century. Compare Act of March 9, 1889, § 2, 1889 Ind. Acts 315 with Act of April 17, 1915, § 1, 1915 Iowa Acts 359, 359–60 ("An act providing punishment for making false charges concerning the honesty of employes [sic]") (codified as amended at Iowa Code Ann. § 730.2 (West 2003)), and Act of March 12, 1897, § 1, 1897 Kan. Sess. Laws 322 ("An act to prevent blacklisting by employers of labor, providing penalties therefor, and for the recovery of damages") (codified as amended at Kan. Stat. Ann. § 44-117 et seq. (2000)).

This period was one of "legal ferment" in our country, as the number of workers in organized labor unions nation-wide had swelled from perhaps 26,000 in the 1830s to over 700,000 by the mid-1880s. Janet Currie & Joseph Ferrie, The Law and Labor Strife in the United States, 1881–1894, 60 J. Econ. Hist. 42 (2000). As states shifted from viewing organized labor movements as criminal conspiracies to legislative acknowledgement of unions, both unions and employers "actively lobbied state governments to have the rules of the bargaining game changed in their favor." Id. at 43–44. These rules frequently changed only after violent clashes between the two sides and the government, resulting in loss of life, property, and industrial productivity. Id. at 43.

Under pressure from employers and industries to ease losses resulting from organized strikes, courts increasingly issued injunctions barring strikes or ordering workers back to work. Id. at 45. At the same time, unions pushed legislatures to regulate work hours, repeal statutes criminalizing strikes, and—most importantly to the questions here—control the conduct of employers "by banning blacklisting of workers who joined unions or went on strike." Id. at 44–45. Indiana's Blacklisting Statute, as is readily apparent from its language, was enacted with a particular eye toward the conduct of railroad companies, though it operates to control the conduct of all employers. See Ind. Code § 22-5-3-2.

Over the course of the twentieth century, blacklisting practices have been challenged in different contexts beyond the industrial unions. See, e.g., Radovich v. Nat'l Football League, 352 U.S. 445 (1957) (former player for non-NFL team claimed NFL leadership and teams

conspired to blacklist him from becoming player-coach in different league); see also Note, "Political" Blacklisting in the Motion Picture Industry: A Sherman Act Violation, 74 Yale L.J. 567 (1965) (discussing "Hollywood Ten" and "Waldorf Declaration" in context of federal labor laws). In recent years, as in this case, blacklisting suits have shifted to the arena of noncompetition and trade secrets. See Lemaster v. Spartan Tool, LLC, 2009 WL 700240 (S.D. Ind. Mar. 16, 2009); Bridgestone/Firestone Inc. v. Lockhart, 5 F. Supp. 2d 667 (S.D. Ind. 1998); Baker v. Tremco Inc., 890 N.E.2d 73 (Ind. Ct. App. 2008), aff'd in part, vacated in part, 917 N.E.2d 650 (Ind. 2009); Burk v. Heritage Food Serv. Equip., Inc., 737 N.E.2d 803 (Ind. Ct. App. 2000).

The scope of conduct prohibited by the Indiana Blacklisting Statute is a discussion we leave for our response to the third certified question.

**I.    Is the Holding of Young Still Valid?**

The text of the Blacklisting Statute provides a cause of action to discharged employees and "any employee who may have voluntarily left said company's service." Ind. Code § 22-5-3-2. In 1904, this Court encountered an employee who voluntarily left his employment and then sued when his former employer allegedly blacklisted him by telling other railroad companies— when asked for a reference—that the employee "was a 'labor agitator' . . . connected with the Order of Railroad Telegraphers of North America." Young 162 Ind. at 104, 69 N.E. at 1005. We held that the portion of the Blacklisting Statute extending protection to employees who were not "discharged" ran afoul of the Indiana Constitution and effectively excised it from the statute. Id. at 104–05, 69 N.E. at 1004–05.

At the time of the Young decision, Article 4, Section 19 of our Constitution said:

> Every act shall embrace but one subject and matters properly
> connected therewith; which shall be expressed in the title. But if

6

> any subject shall be embraced in an act, which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be expressed in the title.

Ind. Const. art. 4, § 19 (1851). The title of the Blacklisting Statute when enacted was "An act for the protection of discharged employes and to prevent blacklisting." Act of March 9, 1889, 1889 Ind. Acts 315. This Court viewed the subject of the statute to be "the protection of discharged employes," and held that preventing the blacklisting of those employees "was a matter properly connected with this subject." Young, 162 Ind. at 104, 69 N.E. at 1004.

On the other hand, we concluded that this subject did not encompass "protection of employes who have not been discharged, or who voluntarily quit the service of their employer." Id. at 104–05, 69 N.E. at 1004. As a result, protection of those employees was not a "matter properly connected with the subject of the protection of discharged employes." Id. Accordingly, the Court held that portion of the Blacklisting Statute void and said instead its protections were "expressly confined to discharged employes." Id.

The holding of Young remained undisturbed through the decades, but the same could not be said for the constitutional underpinnings upon which it was based. In 1960, Article 4, Section 19 was amended to read:

> Every act, amendatory act or amendment of a code shall embrace but one subject and matters properly connected therewith; which subject shall be expressed in the title. But if any subject shall be embraced in an act, amendatory act or amendment of a code, which shall not be expressed in the title, such act, amendatory act or amendment of a code shall be void only as to so much thereof as shall not be expressed in the title. The requirements of this paragraph shall not apply to the original enactments of codifications of laws.

> Every amendatory act and every amendment of a code shall identify the original act or code, as last amended, and the sections or subsections amended shall be set forth and published at full length. The identification required by this paragraph may be made by citation reference.

Ind. Const. art. 4, § 19 (as amended November 8, 1960).  The provision was amended again in 1974, and now reads:

> An act, except an act for codification, revision or rearrangement of laws, shall be confined to one subject and matters properly connected therewith.

Ind. Const. art. 4, § 19 (as amended November 5, 1974).  Thus, though our Constitution still requires an act to be confined to a single subject and properly connected matters, the single subject is no longer tethered to the act's title.  Nor does the Constitution still require that any subject not expressed in the title of the act be made void.  These changes go directly to the analytical process of Young—that the single subject of the act was derived from its title, and that any other matter must therefore be rendered void—and undercut Young as a framework for analyzing claims under the Blacklisting Statute.

Moreover, in the years since 1909, a good many cases analyzing challenges to statutes under Section 19 have employed a more accommodating approach than that taken in Young.

The purpose of this constitutional provision "is to prevent surprise or fraud in the Legislature by means of a provision or provisions in a bill of which the title gave no information to persons who might be subject to the legislation under consideration."  State ex rel. Ind. Real Estate Comm'n v. Meier, 244 Ind. 12, 15–16, 190 N.E.2d 191, 193 (1963) (emphasis added). The provision also works "to prevent a combination of nonrelated subjects in the same act."  Id. at 16, 190 N.E.2d at 193 (emphasis added).  We have therefore held that "if there is any reasonable basis for grouping together in one act various matters of the same nature, and the public cannot be deceived reasonably thereby, the act is valid."  Stith Petroleum Co. v. Dep't of Audit & Control, 211 Ind. 400, 409, 5 N.E.2d 517, 521 (1937).

Cases decided after the 1960 amendment display this approach.  See, e.g., Dortch v. Lugar, 255 Ind. 545, 551, 266 N.E.2d 25, 31 (1971) ("it is not necessary that the title of an act amount to an abstract of its contents, but only that it fairly give notice of the legislative matter

contained therein. . . . we are permitted to indulge in a very liberal interpretation rather than a critical and strict construction calculated to defeat the act"), abrogated on other grounds by Collins v. Day, 644 N.E.2d 72 (Ind. 1994). And we continue to apply this same liberal construction when analyzing statutes against Section 19 as it is written today. See, e.g., Dague v. Piper Aircraft Corp., 275 Ind. 520, 532, 418 N.E.2d 207, 214 (1981) ("[T]his Court has traditionally given broad interpretation to the one-subject requirement, and thereby allowed legislative combinations of matters which, at first blush, might appear quite diverse.").

In fact, similar sentiment appeared occasionally even before Young. See Bright v. McCullough, 27 Ind. 223, 227 (1866) ("[T]he subject expressed should be reasonably specific, or, in other words, should be such as to indicate some particular branch of legislation, as a head under which the particular provisions of the act might be reasonably looked for."); see also Maule Coal Co. of Princeton v. Partenheimer, 155 Ind. 100, 105–06, 55 N.E. 751, 753 (1899) (constitutional restriction is obeyed if law's provisions "relate to the one subject as indicated by the title, and in some reasonable sense may be considered as auxiliary to such subject").

Applying the Single Subject Clause through a constitutional lens reflecting a rule of reason has often been favorable to the legislature's enactments. For example, in Stith we upheld against single-subject attack a statute regulating and controlling petroleum products even though the act's title was nearly 200 words long. 211 Ind. at 407–09, 5 N.E.2d at 520–21 (additional provisions in title addressing inspections, commissions, and penalties related to subject).

In Dortch, we upheld the "Unigov" legislation, concerning "'reorganization of government in counties containing a city of the first class,'" against a claim that this title was insufficiently broad because the legislation effectively destroyed that class of city governments. 255 Ind. at 551–52, 266 N.E.2d at 30–31 (quoting Act of March 13, 1969, 1969 Ind. Acts 357) ("To hold that the Act's title is not sufficiently descriptive of its contents in this case would be placing an undue premium on sheer technical semantics as opposed to substantive meaning.").

9

Similarly, in Bright, we upheld a highway construction and maintenance tax when the law's title was "An act providing for the election or appointment of supervisors of highways, and prescribing certain of their duties, and those of county and township officers, in relation thereto." 27 Ind. at 225, 227 ("the constitution only requires that a proper subject of legislation should be expressed in the title, and not the particular features of details of the law"). In Partenheimer, we upheld a statute authorizing a deceased employee's estate to sue a coal company, when the right of action appeared in one of the act's twenty-four sections and the remaining twenty-three largely related to the weighing of coal. 155 Ind. at 105, 55 N.E. at 753–54 (in statute concerning coal mines, cause of action for damages resulting from violation of those regulations was incidental or auxiliary to general subject); see also In re A.B. v. State, 949 N.E.2d 1204, 1211–12 (Ind. 2011) ("An Act to amend the Indiana Code concerning State and local administration and to make an appropriation," amending statute setting out financial responsibility of Department of Child Services, properly related to appropriation and state budget).

These decisions did not leave Section 19 a dead letter. In Meier, we voided portions of "An act regulating real estate brokers and real estate salesmen, and prescribing penalties for the violation thereof" where it was applied to regulate auctioneers. 244 Ind. at 18–19, 190 N.E.2d at 194. The occupation of auctioneer was historically, and in our statutes, distinct from a real estate broker or salesman and a reasonable person would not have been aware that the legislation contained a licensing requirement for auctioneers. Id.

With this perspective, our answer to this question today is easy enough. Whether Young was wrongly decided in 1904 or not, we hold that it is no longer stare decisis on the question of whether an employee who voluntarily leaves her employment may pursue a claim under the Blacklisting Statute.

The question that naturally follows is whether this means the portion of the statute permitting suits by employees who voluntarily leave their employment survives review under Section 19? In the here and now, the sole issue is whether the act is "confined to one subject and matters properly connected therewith." Ind. Const. art. 4, § 19. We find that it is.

Our approach to this analysis includes the normal deference we show to legislative action, including resolving doubts in favor of the legislation's validity. Dague, 275 Ind. at 531, 418 N.E.2d at 214. We apply the indefinite test of "reasonableness," rather than a structured bright-line rule. Id. (citing State ex rel. Test v. Steinwedel, 203 Ind. 457, 467–68, 180 N.E. 865, 868 (1932)). Section 19 does not intend "a metaphysical singleness of idea or thing, but rather that there must be some rational unity between the matters embraced in the act, the unity being found in the general purpose of the act and the practical problems of efficient administration." Steinwedel, 203 Ind. at 467–68, 180 N.E. at 868). As we have said, "if there is any reasonable basis for grouping together in one act various matters of the same nature, and the public cannot be deceived reasonably thereby, the act is valid." Stith, 211 Ind. at 409, 5 N.E.2d at 521.

The title of the Blacklisting Statute, as we have mentioned, is "An act for the protection of discharged employes and to prevent blacklisting." Act of March 9, 1889, 1889 Ind. Acts 315. As currently structured in the Indiana Code, the 1889 act encompasses two sections. Ind. Code §§ 22-5-3-1, -2 (2007). Section 22-5-3-1 addresses criminal penalties, provides qualified civil immunity for employers who disclose information about former employees unless that information was known to be false, and requires prospective employers to provide copies of the disclosures made by former employers. Section 22-5-3-2 contains the civil cause of action at issue here—including the provision for employees who voluntarily terminate employment.

It seems apparent that there is at least some rational unity between the matters addressed through these provisions. Whether the specific subject is expressed as "protection of former employees," or "prevention of blacklisting," or something else, the provisions are clearly related in their general purpose and for purposes of efficient administration. It is difficult to identify any purpose of deception arising from placing in a general act on blacklisting some elements of law covering employees who voluntarily terminate. Indeed, it seems reasonable that these provisions should be grouped in one act. Accordingly, the provision does not run afoul of Section 19.

## II.    Are Attorney Fees Recoverable as "Compensatory Damages"?

There are two primary ways of allocating attorney fees to the parties in a lawsuit:  the English Rule and the American Rule.  See State Bd. of Tax Comm'rs v. Town of St. John, 751 N.E.2d 657, 658 (Ind. 2001) (citing W. Kent Davis, The International View of Attorney Fees in Civil Suits:  Why Is the United States the "Odd Man Out" in How It Pays Its Lawyers?, 16 Ariz. J. Int'l & Comp. L. 361, 399, 403 (1999)).  Under the first formulation, the losing party pays the fees of the winning.  Id.  Under the second, both parties generally pay their own fees.  Id.[4]

This principle has been the norm in our country since shortly after its founding.  See Arcambel v. Wiseman, 3 U.S. (3 Dall.) 306 (1796) (striking inclusion of attorney fees in award of damages because "[t]he general practice of the United States is in opposition to it").  It "took root in colonial America and matured during the nineteenth century,"  John F. Vargo, The American Rule on Attorney Fee Allocation:  The Injured Person's Access to Justice, 42 Am. U. L. Rev. 1567, 1575 (1993), and was a consequence of repealing colonial laws that permitted the award of attorney fees to the prevailing party, but simultaneously limited the maximum fee chargeable to the client, Davis, supra, at 400.  These laws had caused friction between the English Rule's desire to keep costs low—and thus courts open to all—and "the dominant laissez-faire attitude" of American attorneys who "asserted the freedom to contract with clients for legal services" and sought a "free marketing of legal services."  Vargo, supra, at 1575.

Our rule is thus born of compromise:  while attorneys were permitted to charge a freely negotiable rate and the statutes still tended to permit the award of "costs of litigation," those costs generally excluded attorney fees.  Davis, supra, at 400.  Cf. Ind. Code § 34-52-1-1(a) (2008) (permitting prevailing parties to recover "costs" as part of the judgment).

_____

[4] The phrase "American Rule" is generally attributed to John Goodhart.  Susanne Di Pietro & Teresa W. Carns, Alaska's English Rule:  Attorney's Fee Shifting in Civil Cases, 13 Alaska L. Rev. 33, 37 n.13 (1996) (citing John Goodhart, Costs, 38 Yale L.J. 849 (1929)).

In light of these considerations, Indiana has consistently followed the American Rule. Town of St. John, 751 N.E.2d at 659. Thus, in the absence of statutory authority or an agreement between the parties to the contrary—or an equitable exception[5]—a prevailing party has no right to recover attorney fees from the opposition. Id. (citing Gavin v. Miller, 222 Ind. 459, 465, 54 N.E.2d 277, 280 (1944)).

The Defendants acknowledge our adherence to the American Rule, but instead seek attorney fees under the idea that those fees should be awarded as an aspect of compensatory damages. (Defendant's Br. at 13–15.) They analogize a claim under the Blacklisting Statute to a select few others for which courts have awarded attorney fees as part of the compensatory damages. We believe the cases cited are inapposite.

The Defendants first direct us to cases in which we held that attorney fees were compensable damages in a claim under Indiana's wrongful death statutes. (Defendant's Br. at 13.) Defendants specifically point to Indiana Patient's Compensation Fund v. Brown, 949 N.E.2d 822 (Ind. 2011), but the legal foundation for Brown's holding as to fees was actually announced in McCabe v. Commissioner, Indiana Department of Insurance, 949 N.E.2d 816 (Ind. 2011). And a look at McCabe shows the difference between those cases and the one here.

In McCabe, we addressed the three primary wrongful death statutes: the General Wrongful Death Statute, the Adult Wrongful Death Statute, and the Child Wrongful Death Statute. Id. at 818 (citing Ind. Code §§ 34-23-1-1 (2008) (GWDS), 34-23-1-2 (2008) (AWDS), 34-23-2-1 (2008 & Supp. 2011) (CWDS)). The GWDS and the CWDS both contain explicit

---

[5] There are three well-established common-law exceptions to the American Rule: the "obdurate behavior" exception, the "common fund" exception, and the "private attorney general" exception. Indiana embraces the first two of these and not the third. Town of St. John, 751 N.E.2d at 658–64 (noting that "obdurate behavior" exception is now codified at Indiana Code § 34-52-1-1 and rejecting "private attorney general" exception).

statutory language permitting an award of fees. Id.; see also Ind. Code § 34-23-1-1 ("the necessary and reasonable costs and expenses of administering the estate and prosecuting or compromising the action, including a reasonable attorney's fee"); Ind. Code § 34-23-2-1(f) ("plaintiff may recover damages . . . to pay the expenses of . . . the administration of the child's estate, including reasonable attorney's fees"). The AWDS, however, was enacted without mentioning fees but saying the permissible damages "'may include but are not limited to . . . [r]easonable medical, hospital, funeral, and burial expenses . . . [l]oss of the adult person's love and companionship.'" McCabe, 949 N.E.2d at 818 (emphasis in original) (quoting Ind. Code § 34-23-1-2(c)). The question presented, then, was whether the language "may include but are not limited to" could be interpreted to permit damages in the form of attorney fees. Id. at 819–20.

Acknowledging the American Rule's proscription against the award of attorney fees in the absence of statutory authorization, we interpreted the AWDS in pari materia with the GWDS and held that it provided the necessary authorization. Id. at 820–21. We found that the AWDS was a "mere amplification of damages allowed by the GWDS," and that "[i]f the legislature had desired to exclude elements of damages expressly included in the GWDS" then the easiest way to do so would have been to list them in Section 34-23-1-2(c)(2), with the other forms of prohibited damages. Id. Accordingly, we concluded "that the phrase 'may include but are not limited to' in the AWDS includes the availability of attorney fees and all other elements of damages permitted under the GWDS." Id. at 821.

The McCabe rationale has little force here. To begin with, none of the other statutes in the blacklisting chapter contain an authorization for attorney fees. See Ind. Code §§ 22-5-3-1 (criminalizing blacklisting), -3 (providing public employee whistleblower protections). As such, even if we thought the language of the Blacklisting Statute ambiguous, there is no rational way to apply the "paramount consideration . . . that two statutes that apply to the same subject matter must be construed harmoniously if possible." McCabe, 949 N.E.2d at 820.

14

The relevant language at issue here is hardly ambiguous and we therefore give the statute its ordinary meaning.  Id. at 819.  Moreover, statutes in derogation of the common law must be strictly construed.  Hinshaw v. Board of Comm'rs of Jay Cnty., 611 N.E.2d 637, 639 (Ind. 1993).

The Blacklisting Statute provides that a company that blacklists an employee "shall be liable to such employee in such sum as will fully compensate him, to which may be added exemplary damages."  Ind. Code § 22-5-3-2.  As originally enacted, the statute stated that the blacklisting employer was "liable in treble damages to such employe so prevented from obtaining employment," but the statute was amended to its present form in 1895.  Compare Act of March 9, 1889, § 2, 1889 Ind. Acts 315 with Act of March 11, 1895, § 2, 1895 Ind. Acts 230.  Thus phrased, the statute plainly contemplates only two forms of damages:  compensatory damages and exemplary (i.e. punitive[6]) damages.

The common law at the time the Blacklisting Statute was enacted was clear.  Compensatory damages in tort included "not only such pecuniary loss or injury in a given case as is capable of approximately accurate calculation" but also "such a sum as may be supposed adequate to compensate 'for injury to business or profession, reputation or social position, and for physical suffering . . . and for mental trouble . . . all of which are considered compensatory.'"  State ex rel. Scobey v. Stevens, 103 Ind. 55, 58, 2 N.E. 214, 216 (1885).  This is still the law in Indiana.  See, e.g., Bader v. Johnson, 732 N.E.2d 1212, 1220 (Ind. 2000) ("well-established principle that damages are awarded to fairly and adequately compensate an injured party for her loss").

---

[6] "Exemplary or punitive damages, the terms exemplary and punitive being synonymous, are damages allowed as a punishment or by way of example to deter others from the like offenses, for torts committed with accompanying fraud, malice, or oppression."  State ex rel. Scobey v. Stevens, 103 Ind. 55, 59, 2 N.E. 214, 216 (1885).

But, as we discussed above, the American Rule generally excludes the award of attorney fees from compensatory damages. And unlike the AWDS we analyzed McCabe, there is no ambiguity in the Blacklisting Statute that could be interpreted to authorize the award of attorney fees as compensatory damages.[7]

The Defendants also urge an analogy to claims arising from "litigation-related conduct"—like malicious prosecution, abuse of process, slander of title, and deception—wherein attorney fees may be awarded as an element of damages. (Defendant's Br. at 14–15.) We do not find the analogies persuasive or accurate.

Of course, a claim for deception arises out of a statute that explicitly allows for the recovery of attorney fees. See Ind. Code § 34-24-3-1(3) (2008 & Supp. 2011). The tort of deception, therefore, is a prime example of one of the stated exceptions to the American Rule: statutory authorization.

The remaining claims to which the Defendants point are common law claims. This alone fatally erodes the analogy because a claim for blacklisting is purely statutory. And, as we have discussed already, there is nothing in the Blacklisting Statute—either implicit (as in the AWDS), or explicit (as in the deception statute)—that shows the legislature intended to provide an exception to the American Rule with respect to compensatory damages.

---

[7] By way of comparison, Arizona's blacklisting statute explicitly provides that "a court shall award court costs, attorney fees, and other related expenses to any party that prevails in any civil proceeding in which a violation of this section is alleged." Ariz. Rev. Stat. Ann. § 23-1361(I) (Supp. 2011). Similarly, Kansas's blacklisting protections provide that a person or entity found guilty of blacklisting shall be liable to the injured employee for treble damages and "for a reasonable attorney fee, which shall be taxed as part of the costs in the case." Kan. Stat. Ann. § 44-119 (2000).

In sum, there is nothing about the language, history, or nature of Indiana's Blacklisting Statute that points to anything other than application of the American Rule. Attorney fees may not be recovered as an element of compensatory damages for a plaintiff in a blacklisting claim.

## III.    Is a Lawsuit to Protect Alleged Trade Secrets a Basis for a Blacklisting Claim?

Defendants contend that answering this question in the negative leaves employers "free to use litigation—including sham litigation—to prevent their former employees from obtaining employment," and "circumvent the policy behind the anti-blacklisting statute by suing their former employees, who may have limited or no access to counsel to defend themselves effectively, even if the employer's claims are objectively baseless and pursued in subjective bad faith." (Defendant's Br. at 16.) To the contrary, the common-law torts of malicious prosecution and abuse of process, Indiana Code § 34-52-1-1(b), Indiana Rules of Trial Procedure 11(A) and 12(B)(6), the related Federal Rules of Civil Procedure 11(b)–(c) and 12(b)(6), as well as the federal antitrust laws discussed in CVD, Inc. v. Raytheon Co., 769 F.2d 842, 858 (1st Cir. 1985) are all mechanisms designed to discourage litigants and litigators from bringing baseless and sham actions. They also serve to protect and compensate injured individuals when deterrence fails. The Defendants' contention is untenable.

A. What is Blacklisting?  Beyond this initial argument, the Defendants point to the language of the Blacklisting Statute as offering "'no safe harbors for unsuccessful lawsuits.'" (Defendant's Br. at 16) (quoting Loparex, 2011 WL 672642, at *4). They base this on select language from the statute prohibiting an "'attempt by words or writing, or any other means whatever, to prevent such discharged employee, or any employee who may have voluntarily left said company's service, from obtaining employment with any other person, or company . . . .'" (Defendant's Br. at 16) (quoting Ind. Code § 22-5-3-2). Accordingly, their argument goes, an unsuccessful lawsuit like the one here is just such an "attempt," thus actionable under the Blacklisting Statute.

However, statutes are to be read as a whole, and interpreted with their content in mind. See City of Evansville v. Int'l Ass'n of Fire Fighters, Local 357, 516 N.E.2d 57, 60 (Ind. 1987); see also Smith v. United States, 508 U.S. 223, 233 (1995) ("Just as a single word cannot be read in isolation, nor can a single provision of a statute."). Therefore, as we consider whether a lawsuit to protect trade secrets falls within the conduct envisioned to be prohibited by the Blacklisting Statute, we must look beyond the narrow excerpt Defendants offer up.

That particular phrase—and its broadly inclusive language—immediately follows the more specific prohibition of the Blacklisting Statute: "If a railway company or any other company . . . shall authorize, allow or permit any of its or their agents to black-list any discharged employees . . . ." Ind. Code § 22-5-3-2. And when a phrase consisting of "general words of more comprehensive import" follows one of "specific and limited signification in a statute," we look to the doctrine of ejusdem generis to interpret the scope of the broader phrase. Thompson v. Thompson, 259 Ind. 266, 275–76, 286 N.E.2d 657, 662–63 (1972). The doctrine requires that "the general words . . . be construed as embracing only such persons, places, and things as are of like kind or class to those designated by the specific words, unless a contrary intention is clearly shown by the statute." Id.

The specific words of the statute prohibit blacklisting by an employer or its agents. The exact definition and scope of "blacklisting," however, has been much debated. See Harold W. Horowitz, Legal Aspects of "Political Black Listing" in the Entertainment Industry, 29 S. Cal. L. Rev. 263, 263 (1956) (using the term "to describe in the aggregate various practices of employers in the entertainment industry in utilizing what might be called 'political' tests for employment, and various activities of extra-industry private individuals or groups with respect to the employment of particular individuals in the industry"). Certainly neither the statute nor any of our cases have defined what it means "to black-list" an employee, and a review of other sources yields somewhat varying results.

Black's Law Dictionary defines the practice as putting "the name of (a person) on a list of those who are to be boycotted or punished." Black's Law Dictionary 192 (9th ed. 2009).

Merriam-Webster explains it as "a list of persons that are disapproved of or are to be punished or discriminated against." Merriam-Webster's Third New International Dictionary 227 (unabridged ed. 1993). For example, "an employers' privately circulated list of workers that are to be refused employment because they are reputed to hold opinions or engage in actions contrary to the employers' interests" or "a union list of employers that are to be boycotted because they are reputedly unfair to workers." Id.

Looking to other states, we note that Arizona's statute defines "blacklist" to mean "any understanding or agreement whereby the names of any person or persons, list of names, descriptions or other means of identification shall be spoken, written, printed or implied for the purpose of being communicated or transmitted between two or more employers of labor . . . whereby the laborer is prevented or prohibited from engaging in a useful occupation." Ariz. Rev. Stat. § 23-1361(A) (1995 & Supp. 2011). Oklahoma, in turn, defines "blacklist" as "[a] list of persons marked out for special avoidance, antagonism, or enmity on the part of those who prepare the list or those among whom it is intended to circulate." Nichols v. Pray, Walker, Jackman, Williamson & Marler, P.C., 144 P.3d 907, 911 (Okla. Civ. App. 2006) (quoting State v. Dabney, 141 P.2d 303, 307 (Okla. Crim. App. 1943)). For example, "where a trades-union 'blacklists' workmen who refuse to conform to its rules, or where a list of insolvent or untrustworthy persons is published by a commercial agency or mercantile association." Id. (quoting Dabney, 141 P.2d at 307).

Ohio has defined blacklisting as "[a] combination of employers, the object of which is to wrongfully and maliciously prevent a discharged employe from obtaining employment." Mulholland v. Waiters' Local Union No. 106, 103 Ohio Dec. 342, 1902 WL 1025, at *16 (Ohio Com. Pl. 1902) (quoting 1 Eddy, Combinations, § 574). There, the court noted that the particular evil of blacklisting (and of a corollary employee practice of placing employers on an "unfair list") is "a violation of the constitutional rights of the individual to pursue any calling he will, not in violation of law, without fear or force or oppression from his fellow men." Id.

Similarly, the North Carolina courts, in applying a statute with language close to ours,[8] noted that the purpose of its law was neither to "attempt to interfere with the right of an employer to discharge an employee for cause, or without cause" nor "to prohibit an employer from communicating to other employers the nature and character of their employees, when the facts would be for their interest."[9] Goins v. Sargent, 146 S.E. 131, 133 (N.C. 1929) (citing Seward v. Receivers of S.A.L. Ry. Co., 75 S.E. 34 (N.C. 1912)). Rather, the purpose of North Carolina's statute was "to protect employees in the enjoyment of their natural rights and privileges guaranteed them by the Constitution, viz., the right to sell their labor and acquire property thereby." Id. (citing Seward, 75 S.E. at 34).

Though these definitions differ somewhat in terminology, we think they embrace two common elements: the physical blacklist itself, and a range of related activities aimed at a similar goal as the blacklist, but that perhaps do not include an actual, tangible list.

The structure of Indiana's statute reflects this approach, making an employer liable if it "black-list[s] any discharged employees" and also when it "attempt[s] by words or writing, or any other means whatever, to prevent such . . . employee . . . from obtaining employment with any other person, or company." Ind. Code § 22-5-3-2.[10] Informed by the approaches taken in

---

[8] "If any person, agent, company or corporation, after having discharged any employee from his or its service, shall prevent or attempt to prevent, by word or writing of any kind, such discharged employee from obtaining employment with any other person, company or corporation . . . ." Act of March 8, 1909, § 1, 1909 N.C. Sess. Laws 1259 (codified as amended at N.C. Gen. Stat. § 14-355 (2011)).

[9] This same privilege, permitting a past employer to provide truthful information concerning the employee's discharge, is found in many other state statutes, including ours. See Ind. Code § 22-5-3-1(a), -1(b); see also Iowa Code Ann. § 730.1 (2003); Kan. Stat. Ann. §§ 44-117, -119a; Mont. Code Ann. § 39-2-802 (2009).

[10] Some other state blacklisting statutes also follow this dual framework. See, e.g., Iowa Code Ann. § 730.2; Mont. Code Ann. § 39-2-803 (2009).

other states with similar statutes, this dual structure makes application of ejusdem generis a simpler endeavor.

In light of the particular history of blacklisting, we think the specific prohibition—the actual blacklist—is best defined as a list of one or more workers, circulated by employers, who are to be refused employment or otherwise marked for special avoidance, antagonism, or enmity, because those workers are reputed to hold opinions or engage in actions contrary to the employers' interests. The act of blacklisting, then—or as the statute says, "to black-list"—would be transmission or distribution of this list from one employer to another, with the wrongful intent of preventing those employees from obtaining future employment within that industry.

In accordance with ejusdem generis, the more general language would encompass only those activities of a like kind or class to the classic manner of blacklisting. To this end, our review of other blacklisting statutes and case law identifies a series of underlying commonalities which are helpful guides for interpreting any "attempt by words or writing, or any other means whatever." Ind. Code § 22-5-3-2. We thus frame its prohibitions as including impermissible conduct such as: an identification or categorization of past employees based upon their conduct, association, or belief; the transmission or exchange of that information by or between employers in the same industry; and doing so with the wrongful intent to inhibit or prevent a listed employee from obtaining future employment within that industry.

B. Is a Lawsuit to Protect Trade Secrets Prohibited? So armed, we now proceed to the heart of the certified question itself. The question asks, "Is an unsuccessful suit to protect alleged trade secrets, within which a former employer seeks to preclude any competitive employment of a former employee by pursuing permanent injunctive relief and in settlement negotiations, a basis for recovery under Indiana's Blacklisting Statute?" This question is unnecessarily narrow.

First, differentiating between a successful and an unsuccessful lawsuit seems inappropriate. In an analogous subject matter, we have said that a claim is not necessarily

21

frivolous, groundless, or unreasonable simply because it is unsuccessful. See Kahn v. Cundiff, 533 N.E.2d 164, 170–71 (Ind. Ct. App. 1989), adopted on transfer, 543 N.E.2d 627 (Ind. 1989). We think it is equally accurate to say that whether a lawsuit is successful or not should not be completely dispositive in deciding whether that lawsuit constituted blacklisting—the outcome of the lawsuit is not the issue, the question is whether filing the lawsuit constitutes blacklisting.

Further, it seems inappropriate to consider statements made in the context of settlement negotiations as proof of whether one party committed blacklisting. Both the Federal and Indiana Rules of Evidence generally prohibit the admission of statements made during the course of settlement negotiations in order to prove liability on a claim. See Fed. R. Evid. 408(a)(2); Ind. Evidence Rule 408. The purpose of these rules is to encourage the nonlitigious resolution of disputes by promoting candor and bargaining during settlement negotiations. See S.A. Healy Co. v. Milwaukee Metro. Sewerage Dist., 50 F.3d 476, 480 (7th Cir. 1995); Worman Enter., Inc. v. Boone Cnty. Solid Waste Mgmt. Dist., 805 N.E.2d 369, 376–77 (Ind. 2004). While both rules permit the admission of such statements into evidence under certain other circumstances, incorporating this aspect of the certified question into our analysis here—and implying it should weigh in the balance for future examinations of blacklisting claims—would risk running afoul of these provisions. And knowing that their bargaining tactics and statements would be used as evidence in an automatic blacklisting suit, should their dispute not settle, would most certainly chill the negotiating process for employers and, ultimately, for the employees as well.

Thus winnowed, we view the question as follows: whether a lawsuit to protect alleged trade secrets, brought by an employer against a former employee, falls within the framework of blacklisting prohibitions we discuss above. We conclude that it does not.

We have found only a few cases from other states providing examples of employer conduct that violated a blacklisting statute. See, e.g., Goins, 146 S.E. at 131 (former employer, quarry, sent letter to every company in state that might hire employee, union stonecutter, threatening to cut business ties if they hired employee); Dabney, 141 P.2d at 303 (former

employer found criminally liable for mailing letter to employee's current company, alleging employee was a trouble-maker who had caused problems in her former workplace).

The cases holding that a given employer conduct was not blacklisting seem more numerous. See, e.g., Newberry v. Pacific Racing Ass'n, 854 F.2d 1142 (9th Cir. 1988) (employer made factually accurate statement, and not false misrepresentations, when it told potential future employer that employee, ticket-seller at racetrack, had problems handling money); Glenn v. Diabetes Treatment Ctrs. of America, Inc., 116 F. Supp. 2d 1098 (S.D. Iowa 2000) (employer refused to allow employee to begin working for new company while still working for employer); Cortes v. McDonald's Corp., 955 F. Supp. 531 (E.D.N.C. 1996) (potential employers solicited references from former employer and therefore, though negative, the references were within the former employer's privilege); French v. Foods, Inc., 495 N.W.2d 768 (Iowa 1993) (employee fired for theft, but all communications regarding theft investigation were kept internal to employer).

A number of similar such cases, both federal and state, have applied Indiana law in denying claims of blacklisting. See, e.g., Tomanovich v. City of Indianapolis, 457 F.3d 656 (7th Cir. 2006) (no violation of Section 22-5-3-1 where former employer did not provide false information); Kentner v. Timothy R. Downey Ins., Inc., 430 F. Supp. 2d 839 (S.D. Ind. 2006) (employer not liable under Blacklisting Statute when it had valid business reason for contacting other employers in industry and no evidence that the contact prevented employee from being rehired); Hull v. Cent. Transport, Inc., 628 F. Supp. 784 (N.D. Ind. 1986) (blacklisting claim preempted by federal labor law, but regardless Section 22-5-3-1 not violated when employee failed to show he sought—and was denied—employment).

More significantly, in a series of recent cases the Indiana Court of Appeals has applied the Blacklisting Statute in the context of noncompetition agreements. These cases have held that Section 22-5-3-2 is not violated when an employer attempts to enforce a noncompetition agreement against the former employee.

For example, in <u>Burk v. Heritage Food Service Equipment, Inc.</u>, 737 N.E.2d 803 (Ind. Ct. App. 2000), the Court of Appeals addressed a blacklisting counterclaim filed by two employees whose former employer sued them for breach of a noncompetition and confidentiality agreement. One employee had been discharged, but the other had voluntarily terminated her employment. The Court of Appeals upheld portions of the noncompetition agreement following blue-pencil revision. <u>Id.</u> at 816. The agreements also prohibited disclosure of trade secrets, and the Court of Appeals upheld a finding that the terminated employee breached this provision of his agreement. <u>Id.</u> at 808, 814.

However, the court also expressed doubt about the validity of either employee bringing a blacklisting claim under these circumstances. As for the employee who voluntarily terminated her employment, the court followed <u>Young</u> and denied relief. <u>Id.</u> at 817–18. But the court also implied that the employee's claim failed on the merits regardless because there was no showing that the employer attempted to prevent her from obtaining employment. <u>Id.</u> at 818. Instead, it "attempted to enforce a covenant prohibiting activities that [the employee] might have engaged in" with her new employer. <u>Id.</u> Similarly, with respect to the discharged employee, the Court of Appeals held that while he had standing to bring a blacklisting claim under <u>Young</u>, his claim failed because there was no showing that the defendant employer had attempted to prevent him from obtaining employment either. Moreover, the former employer had been successful in its claims, and "[s]uccessfully litigating a claim against a former employee does not fall within the prohibitions of the Blacklisting statute." <u>Id.</u> at 818–19.

<u>Burk</u> was followed a few years later by <u>Baker v. Tremco Inc.</u>, 890 N.E.2d 73 (Ind. Ct. App. 2008). There, an employee subject to a noncompetition agreement resigned and formed his own company. In this capacity he began directly competing with a subsidiary of his former employer and attempted to solicit customers of the former employer. After receiving a cease-and-desist letter, the employee filed suit seeking declaratory judgment as to the enforceability of the noncompetition agreement, alleging tortious interference with his business contracts, and pleading violation of the Blacklisting Statute. The former employer, in turn, filed a counterclaim for breach of the agreement. The Court of Appeals found no violation of the noncompetition

agreement because, under applicable Ohio law, it did not prohibit competition against a separately incorporated subsidiary. Id. at 78–79.

With respect to the blacklisting claim, the Baker court adopted Burk's suggestion that the Blacklisting Statute "would not apply in a case where a former employer has attempted to enforce a noncompete clause against the former employee working for a new employer." Id. at 86 (citing Burk, 737 N.E.2d at 818). "By the statute's plain language, a former employer may not attempt to prevent a former employee from 'obtaining employment[.]'" Id. (quoting Burk, 737 N.E.2d at 818). The Baker employee, however, had not alleged a denial of employment—only a loss of business. Id.

This Court summarily affirmed the portion of Baker dealing with the Blacklisting Statute, but doing so did not, under Indiana's Rules of Appellate Procedure, make that decision a part of this Court's authority. Baker v. Tremco Inc., 917 N.E.2d 650, 653 n.1 (Ind. 2009); see also Ind. Appellate Rule 58(A).

By contrast, while there are no reported decisions from Indiana's appellate courts finding a violation of the Blacklisting Statute, the U.S. District Court for the Southern District of Indiana did so in a case pre-dating Burk and Baker. Bridgestone/Firestone Inc. v. Lockhart, 5 F. Supp. 2d 667 (S.D. Ind. 1998).

In Lockhart, as in the present case, a former employer sued its former employee to enforce noncompetition covenants. The employer sought to enjoin the employee from working for a competitor, but its claims were unsuccessful and the employee filed a counterclaim under the Blacklisting Statute.[11] The Lockhart court looked to the same portion of the statute at issue

---

[11] The Lockhart court found no evidence that the employee had violated, or was likely to violate, any obligation to maintain the confidentiality of the employer's trade secrets. Lockhart, 5 F. Supp. 2d at 682. It further found that the noncompetition agreement was unreasonably broad and unenforceable. Id. at

in this case and noted that it "is worded broadly, and deliberately so, especially with its use of the phrase 'or any other means whatever.'" Id. at 688 (quoting Ind. Code § 22-5-3-2). "It requires no creative interpretation or stretch of language to treat an unsuccessful lawsuit seeking an injunction against employment as an 'attempt by words or writing, or any other means whatever' to prevent [the employee] . . . from 'obtaining employment with any other person, or company.'" Id. (quoting Ind. Code § 22-5-3-2). "The statute offers no safe harbors for unsuccessful lawsuits." Id.

The Defendants, quite naturally, urge us to follow Lockhart in deciding whether a suit to protect trade agreements violates the Blacklisting Statute. (Defendant's Br. at 17.) The Plaintiffs, on the other hand, would have us fully adopt Baker and extend its coverage to lawsuits by employers who seek to prevent the misappropriation of trade secrets. (Plaintiff's Br. at 22–24.) For several reasons, we agree with the Plaintiffs.

First, substantial policy concerns militate against the Lockhart approach. It effectively creates a form of per se blacklisting, whereby any unsuccessful lawsuit to enforce a noncompetition agreement or protect trade secrets—and without any finding of the suit being frivolous, baseless, brought in bad faith, or motivated by malice—would itself provide grounds for a retaliatory blacklisting claim awarding compensatory damages, attorney fees, and potential punitive damages. Rather than vitiating any in terrorem effect of a noncompetition agreement, this approach would multiply it. It would create a standoff between the former employer, potential employer, and the employee, and the threat of their own mutually assured destruction would deter everyone from seeking any redress whatsoever. While this approach may work well

---

685. As for whether the claims were maliciously brought, frivolous, shams, or baseless, the court expressly found to the contrary in refusing to award punitive damages. Id. at 689 ("In this case the plaintiff [employer] had a reasonable basis in law and fact for filing and pursuing the lawsuit.").

as a plot device in movies, or as a strategic nuclear policy, we would prefer it not be the norm in such a routine body of law as employer-employee litigation.

Second, <u>Lockhart</u> represents too expansive a view of the evils at which the Blacklisting Statute was aimed. While the statute exists to protect employees, it seeks to protect them from the particular evil of classic blacklisting. It should not be viewed as an alternative to those mechanisms we enumerate above that deter and punish baseless and oppressive litigation.

Finally, <u>Lockhart</u> was decided without the benefit of <u>Burk</u>, <u>Baker</u>, and the guidance we provide above regarding the scope of conduct prohibited by the phrase "attempt . . . or any other means whatever." As we have indicated, the phrase is broad but it is not all inclusive. It embraces conduct that identifies or categorizes past employees based upon their conduct, association, or belief; the transmission or exchange of that information by or between employers in the same industry; and doing so with the wrongful intent to inhibit or prevent those employees from obtaining future employment within that industry. Simply put, a lawsuit—successful or not—to protect trade secrets or seeking to enforce a noncompetition agreement does not, on its own, fall within that scope.

We do not discount the possibility that an ill-minded employer might attempt to misuse the court system to leverage its business interests over the rights of a former employee, and the law provides a number of remedies and defenses for the former employee who is so besieged. The Indiana Blacklisting Statute, however, is not one of them.

## Conclusion

For these reasons, we answer the District Court's questions as indicated above: no, no, and no.

Dickson, Sullivan, Rucker, and David, JJ., concur.

27