## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 13 2017, 7:09 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEES

Brent E. Steele
Steele & Steele, LLC
Bedford, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Stewart H. Hudson and
Shelia D. Hudson,

*Appellants-Defendants,*

v.

The Winford D. Dixon
Revocable Living Trust,
Crystal J. Dixon, Trustee,
Trevor Robbins,
Amanda Robbins,

*Appellees-Plaintiffs*

December 13, 2017

Court of Appeals Case No.
47A01-1704-PL-865

Appeal from the Lawrence Circuit
Court

The Honorable Andrea K.
McCord, Judge

Trial Court Cause No.
47C01-1505-PL-699

**Baker, Judge.**

[1] Stewart and Shelia Hudson appeal the trial court's order granting the quiet title action filed by The Winford D. Dixon Revocable Living Trust (the Dixon Trust) and Trevor and Amanda Robbins. The Hudsons contend that the trial court erroneously determined that the Dixon Trust and the Robbinses established adverse possession of the disputed property. Additionally, the Hudsons appeal the trial court's denial of their request for an easement of necessity over a portion of land owned by the Dixon Trust. Finding no error, we affirm.

# Facts

[2] In 1881, Mary Dixon acquired a parcel of real estate in Lawrence County. In 1898, Mary sold a portion of that real estate to Emma (Dixon) Dodds. That real estate is now owned by the Dixon Trust (the Dixon Trust Property).[1] In 1899, Mary sold the other portion of her real estate to Josiah and Thomas Dixon. That property was transferred five times within the Dixon family between 1899 and 2006, when it was sold to Kevin and Tammie Biddle. In 2013, the Biddles lost the property in foreclosure to Farm Credit Services, which sold it to the Hudsons in 2014. The Hudsons are the current owners of that real estate (the Hudson Property). The Dixon Trust Property, which is approximately 19 acres, and the Hudson Property, which is approximately 108 acres, abut one another.

---

[1] The Robbinses have an equitable interest in the Dixon Trust Property pursuant to a land contract.

[3] The area of real estate in dispute (the Disputed Property) is a 2.5-acre tract that is wholly contained within the legal description of the Hudson Property. The Disputed Property is located between a creek and the legal boundary line separating the Dixon Trust Property from the Hudson Property. Some parts of the Disputed Property are mowed, while others are overgrown with brush and trees. Many decades ago, a fence was erected along the creek. Throughout the history of the two properties, the owners have treated the creek/fence line as the boundary line.

[4] Hubert Thomas Dixon (Tommy) was a predecessor in title to the Hudsons; he owned the Hudson Property from 1980 through 2006. Tommy testified that the Disputed Property was always used and maintained by the Dixon family. According to Tommy, Winford Dixon—prior owner of the Dixon Trust Property, which was placed in the family trust in 2008—had the hay cut from the Disputed Property from the time he acquired the real estate in 1958. Additionally, Winford installed a septic system at some point during his ownership of the real estate, and the septic field extends underneath the Disputed Property. Winford farmed part of the Disputed Property and his family occasionally used part of it as a softball field.

[5] The Hudson Property contains a field on the northeast segment of the real estate (the Back Property). When Tommy owned this real estate, he used the Dixon driveway and a trail beyond it to access the Back Property, but always got permission from Winford before doing so. No one accessed the Back Property or the trail beyond it without Winford's permission.

[6]    When Tommy sold the Hudson Property to the Biddles in 2006, he told them that he would introduce them to Winford and that they would have to resolve any desired use of Winford's property with him. An old road, since overgrown, called the Hubert Dixon Road, can also be used to access the Back Property; that road is on the Hudson Property. The Hudsons have used a tractor to access the Back Property via the Hubert Dixon Road. Winford gave permission to the Biddles to use the driveway and trail to the Back Property. He later withdrew that permission, however, because the Biddles were driving up and down the driveway too fast on their four-wheeled vehicles and had turned his driveway into "a playground for the kids that lived with the Biddles." Tr. Vol. II p. 34. After that, no one aside from Winford, his family, and people hired by them used the driveway.

[7]    After Tommy sold the Hudson Property to the Biddles, the person with whom Winford contracted to cut and remove the hay on the Disputed Property continued to do so. The Biddles did not tell that individual to get off their property.

[8]    In August 2014, Amanda and Trevor Robbins entered into a contract to purchase the Dixon Trust Property. Two months later, the Hudsons acquired their real estate. Stewart Hudson asked Amanda where she thought the property line was, and she replied that she believed it was the creek. He also asked her for permission to come through her back field if water blocked the bridge to his house; the Robbinses agreed. After having a survey performed, the Hudsons presented the Robbinses with a contract to exchange a fifty-foot

easement for the Disputed Property.[2]  The Hudsons intended to use the easement to build a county-managed road, install utilities, and build houses on the Back Property.  The easement would have removed a portion of the Robbinses' garage, and the Robbinses believed that the Disputed Property already belonged to them, so they refused to sign.  After that, relations between the neighbors deteriorated dramatically.

[9]  On May 29, 2015, the Dixon Trust and the Robbinses filed a complaint to quiet title to the Disputed Property.  On July 28, 2015, the Hudsons filed an answer and a counterclaim seeking a prescriptive easement and an easement of necessity for access to the Back Property.  A bench trial took place on February 16, 2017.  At this time, the Lawrence County Courthouse was under reconstruction and work was being done on the roof.  The trial proceeded, and none of the parties objected based on noise levels.  Subsequent to the hearing, the trial court judge conducted a visual inspection of the real estate at issue.

[10]  On March 27, 2017, the trial court ruled in favor of the Dixon Trust and the Robbinses on their quiet title action and ruled against the Hudsons on their request for an easement.  In pertinent part, the trial court found as follows:

---

[2] The Hudsons presented a similar agreement to the trustee of the Dixon Trust; she also declined.

*Easement of Necessity*

20. The [Hudsons'] home residence abuts a blacktop county road which provides access to any and all of the [Hudsons'] real estate.

21. The aerial pictures entered into evidence at the trial show there were trails and roadways leading across various places on the lands of the [Hudsons] to [the Back Property].

22. Upon a physical examination and walk-through of the real estate, the Court saw what appeared to be a road made with some sort of heavy equipment with gravel on it, with an incline that appeared able to be traveled on by a four-wheel drive vehicle and did not appear particularly cumbersome.

\*\*\*

24. The court finds in favor of [the Dixon Trust] and against the [Hudsons] in their request for an easement of necessity.

*Adverse Possession*

25. Upon a physical examination of the property by the Court, old, rusted wire was found growing out of the dead center of a large sycamore tree. Old, but newer wire fencing had been installed outside the tree. The Court could see the fence had been placed and maintained over many years, with fence ranging from woven wire embedded in the trees to barbed wire from two (2) different periods of time, one more dilapidated and rusted than the newer. The Court finds that the wire fence along the branch of the creek

bordering the [Disputed Property] had been placed along this property line a very long time ago in the history of this real estate.

26.	[Tommy] testified that he was born on this property in 1936, grew up on the real estate and the wire fence along the creek had been the boundary line since his father acquired the real estate. . . . He testified he never thought he owned any real estate beyond the creek.

27.	[Multiple witnesses] all testified that the [Dixon Trust] and its predecessors in title used the [Disputed Property] for everything from placement of a wrought iron fence in the early 1900s, septic fingers and tank in 1959, erecting clothesline and poles many years ago . . . , placing satellite TV antennae in the 1990s, farming operations cutting hay, planting and harvesting crops for decades and as a softball field.

***

29.	The fence in this case was in existence for over seven (7) decades prior to the Hudson's [sic] purchase of their real estate in 2014, far in excess of the ten (10) years required for adverse possession. The Dixon family acquiesced to and set this fence line a long, long time ago.

30.	The [Disputed Property] was always used by [the Dixon Trust] and its predecessors in title and never by the [Hudsons'] or their predecessors in title.

***

37. [The Dixon Trust and the Robbinses] have met their burden of proof regarding adverse possession . . . .

38. Title to the [Disputed Property] should be quieted in the name of the [Dixon Trust], free and clear of any claim of the [Hudsons].

Appealed Order p. 6-10. The Hudsons now appeal.

# Discussion and Decision

## I. Due Process

First, the Hudsons argue that their procedural due process rights were violated because of the construction to the courthouse that was ongoing during the trial. According to the Hudsons, the noise made it difficult to hear testimony and caused many portions of the transcript to be indecipherable. Procedural due process "is the opportunity to be heard at a meaningful time and in a meaningful manner," *Perdue v. Gargano*, 964 N.E.2d 824, 832 (Ind. 2012), and generally includes "'an opportunity to present every available defense,'" *Morton v. Ivacic*, 898 N.E.2d 1196, 1199 (Ind. 2008) (quoting *Lindsey v. Normet*, 405 U.S. 56, 66 (1972)).

Initially, we note that the Hudsons did not object to the trial court's decision to proceed with the trial in the midst of the ongoing construction. Moreover, they did not file a motion to correct error or a motion for relief from judgment related to the construction noise. As a result, this argument has been waived.

[13] Waiver notwithstanding, we note that the court reporter executed an affidavit explaining that the numerous instances of "indiscernible" in the transcript were the result of malfunctioning recording equipment, not of the noise in the courtroom. Appellees' App. Vol. II p. 15. Moreover, the court reporter attested that there was special equipment available for people with hearing impairments, but no one requested to use that equipment during the trial.

[14] In any event, the Hudsons received a full and fair trial, including direct and cross-examination of witnesses and an in-person trip to the properties by the trial court judge. The Hudsons also filed a post-trial brief in support of their positions, meaning that they were able to present the trial court with their arguments in writing—a format entirely unaffected by the noise in the courtroom. Under these circumstances, we decline to reverse based on due process concerns.

## II. Adverse Possession

[15] The Hudsons next argue that the trial court erroneously determined that the Dixon Trust is entitled to adverse possession of the Disputed Property. To establish adverse possession, a claimant must show "clear and convincing proof of control, intent, notice, and duration." *Fraley v. Minger*, 829 N.E.2d 476, 485 (Ind. 2005). These elements, which must be satisfied for a period of ten years, are defined as follows:

> (1) Control—The claimant must exercise a degree of use and control over the parcel that is normal and customary considering the characteristics of the land (reflecting the

former elements of "actual," and in some ways "exclusive," possession);

(2) Intent—The claimant must demonstrate intent to claim full ownership of the tract superior to the rights of all others, particularly the legal owner (reflecting the former elements of "claim of right," "exclusive," "hostile," and "adverse");

(3) Notice—The claimant's actions with respect to the land must be sufficient to give actual or constructive notice to the legal owner of the claimant's intent and exclusive control (reflecting the former "visible," "open," "notorious," and in some ways the "hostile," elements); and,

(4) Duration—the claimant must satisfy each of these elements continuously for the required period of time (reflecting the former "continuous" element).

*Id.* at 486. In evaluating the trial court's conclusion that adverse possession was established, we may consider only the probative evidence and reasonable inferences supporting the judgment, may not reweigh evidence or assess witness credibility, and will affirm if a reasonable trier of fact could conclude that the judgment was established by clear and convincing evidence. *Id.* at 483.

## A. Notice

[16] The only *Fraley* element challenged by the Hudsons in this case is the element of notice. According to the Hudsons, the actions of the Dixon Trust and its

predecessors in title were not sufficiently visible, open, and notorious to establish this element by clear and convincing evidence.

[17] The record reveals the following evidence regarding the use of the Disputed Property by the Dixon Trust and its predecessors in title:

- The Dixon family had large portions of the Disputed Property mowed.
- They also farmed part of the Disputed Property.
- The Disputed Property included a yard in which the family sometimes played softball, as well as a clothesline and a satellite television dish.
- Winford had a septic system constructed, and the septic field underlies part of the Disputed Property.
- A fence consistent with the use of the Disputed Property by the Dixon Trust and its predecessors in title has been in place for many decades.
- Throughout the years, the respective owners of the Dixon Trust Property and the Hudson Property have believed that the Disputed Property is part of the Dixon Trust Property and have acted accordingly.

This evidence supports the trial court's conclusion that the Dixon Trust established the notice element of adverse possession. While the Hudsons direct our attention to other evidence in the record supporting their argument that notice was not established, this amounts to a request that we reweigh the evidence—a request we decline.

## B. Taxes

[18] In addition to the elements described by our Supreme Court in *Fraley*, an adverse possessor must also comply with Indiana Code section 32-21-7-1 regarding payment of taxes. This statute requires an adverse possessor to pay all taxes and special assessments that the adverse possessor reasonably believes

in good faith to be due on the property during the period of claimed adverse possession.  I.C. § 32-21-7-1(a).

[19]  The Hudsons contend that the Dixon Trust failed to establish compliance with Indiana Code section 32-21-7-1 and that the trial court erred by neglecting to make a finding regarding payment of taxes.

[20]  At the outset of the trial, the parties informed the trial court that "[w]e've also stipulated through the (indiscernible) decision that taxes are what they are.  The Plaintiff and Defendant have each paid the taxes in accordance with their tax papers as sent by the Treasurer."  Tr. Vol. II p. 3-4.  The Hudsons argue that the Dixon Trust should have entered those "tax papers" into evidence, but we cannot agree that this action was required given that the parties had stipulated to the issue.

[21]  While this stipulation is far from a model of clarity, it is apparent that the parties were endeavoring to simplify the litigation by agreeing on the issue of taxes from the outset.  Stipulations are binding upon the parties and the trial court and may not be challenged on appeal.  *E.g.*, *Norris Ave. Prof'l Bldg. P'ship v. Coordinated Health, LLC*, 28 N.E.3d 296, 299 (Ind. Ct. App. 2015); *Wayne Twp. v. Lutheran Hosp. of Fort Wayne, Inc.*, 590 N.E.2d 1130, 1133 (Ind. Ct. App. 1992).  Because the parties stipulated that the Dixon Trust had paid all taxes, presumably including the Disputed Property, the Hudsons may not now challenge that fact.

[22] As for whether the trial court was required to include a finding regarding taxes, we agree that it would have been the better practice to have done so. But we cannot say that the trial court was *required* to do so, since the parties had expressly agreed on the issue. Furthermore, were we to rule in favor of the Hudsons on this point, the remedy would be to remand to the trial court to add a finding regarding taxes, which would just be a recitation of the parties' stipulation—hardly an efficient use of judicial resources. Therefore, we decline to reverse or remand on this basis.

# III.  Easement

[23] Finally, the Hudsons argue that the trial court erred by denying their request for an easement of necessity on a portion of the Dixon Trust Property.[3] This Court has explained easements of necessity as follows:

> An easement of necessity will be implied when "there has been a severance of the unity of ownership of a tract of land in such a way as to leave one part without access to a public road." An easement of necessity may arise, if ever, only at the time that the parcel is divided and only because of inaccessibility then existing. To demonstrate that an easement of necessity should be implied, a plaintiff must establish both unity of title at the time that tracts of land were severed from one another and the necessity of the easement.

***

---

[3] They do not appeal the trial court's finding that they are not entitled to a prescriptive easement.

> To demonstrate that the easement is "of necessity," a plaintiff must demonstrate more than that the easement would be beneficial or convenient. *If the plaintiff has another means of accessing his land, he may not claim a right to pass over the land of another. This rule controls even if the alternate means of access would be more difficult or expensive for the plaintiff.*

*Cockrell v. Hawkins*, 764 N.E.2d 289, 292 (Ind. Ct. App. 2002) (emphasis added) (internal citations omitted).

[24] Stewart testified that there was no "practical" way to get to the Back Property other than through the Dixon Trust Property. Tr. Vol. II p. 95. But he also testified that he was able to use a tractor to access the Back Property over his own land to clear trees on the Back Property. *Id.* at 95-96. Additionally, the trial court found further evidence that the Hudsons would be able to access the Back Property without having to traverse the Dixon Trust Property:

- The Hudsons' home abuts a blacktop road that "provides access to any and all of the [Hudsons'] real estate." Appealed Order p. 6.
- Aerial pictures establish that there are "trails and roadways leading across various places" on the Hudson Property to the Back Property. *Id.*
- The trial court judge herself walked through the property and observed "what appeared to be a road made with some sort of heavy equipment with gravel on it, with an incline that appeared able to be traveled on by a four-wheel drive vehicle and did not appear particularly cumbersome." *Id.*

This evidence readily supports the trial court's conclusion that the Hudsons have a means—possibly multiple means—of accessing the Back Property that does not involve traveling over a portion of the Dixon Trust Property.

Consequently, we find that the trial court did not err by denying the Hudsons' request for an easement of necessity.

[25] The judgment of the trial court is affirmed.


Riley, J., and Brown, J., concur.